UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

NAJEEB AHMED KHAN,[1]

       Debtor.

_____/

Case No. 19-04258
Hon. Scott W. Dales
Chapter 11

In re:

KHAN AVIATION, INC., *et al.*,[2]

       Debtors.

_____/

Case No. 19-04261
Hon. Scott W. Dales
Chapter 11
(Jointly Administered)

In re:

INTERLOGIC OUTSOURCING, INC., *et al.*,[3]

       Debtors.

_____/

Case No. 20-00325
Hon. Scott W. Dales
Chapter 11
(Jointly Administered)

MARK IAMMARTINO,

       Plaintiff,

v.

LAKE CITY BANK, LAKELAND
FINANCIAL CORPORATION, BRADLEY
TOOTHAKER, KRISTIN PRUITT, ERIC
OTTINGER, LISA O'NEILL, DAVID
FINDLAY, and NAJEEB A. KHAN,

       Defendants.

_____/

Adversary Pro. No. 21-80071

---

[1] Estate Tax I.D. No.: 84-6804873.

[2] The Debtors in these jointly administered cases (the "Khan Entity Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: Khan Aviation, Inc. (0145), GN Investments, LLC (3550), KRW Investments, Inc. (4356), NJ Realty, LLC (3761), NAK Holdings, LLC (4717), and Sarah Air, LLC (4718).

[3] The "IOI Debtors," along with the last four digits of each Debtor's federal tax identification number are: Interlogic Outsourcing, Inc. (1273); IOI Payroll Services, Inc. (1202); TimePlus Systems, LLC (9477); IOI West, Inc. (1405); Lakeview Technology, Inc. (1451); Lakeview Holdings, Inc. (7589); and ModEarn, Inc. (3473).

<u>MEMORANDUM OF DECISION AND ORDER</u>

PRESENT:    HONORABLE SCOTT W. DALES
Chief United States Bankruptcy Judge

<u>INTRODUCTION</u>

Plaintiff Mark T. Iammartino, not individually, but solely as the Liquidating Trustee for the Consolidated Estate Trust for the bankruptcy estates of Najeeb A. Khan, the Khan Entity Debtors, and the IOI Debtors (the "Trustee" or "Plaintiff"), seeks judgment avoiding and recovering numerous transfers, disallowance or subordination of claims, and damages based on the role that each defendant allegedly played in a capacious check kiting scheme that ended abruptly in the summer of 2019, resulting in the numerous bankruptcies identified in the caption.

Defendants Lake City Bank, Lakeland Financial Corporation ("Lakeland"), David Findlay, Lisa O'Neill, Eric Ottinger, Kristin Pruitt (the "LCB Defendants"), and Bradley Toothaker (with Lakeland and the LCB Defendants, collectively the "Defendants") seek dismissal of the Trustee's Second Amended Complaint (ECF No. 44, the "SAC") for failure to state a claim under Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012.[4] *See* Motion to Dismiss (filed by Mr. Toothaker) (ECF No. 68, hereinafter "Toothaker MTD") and Defendants' Motion to Dismiss the Second Amended Complaint (filed by Lakeland and the LCB Defendants) (ECF No. 70, hereinafter "Lake City Defendants' MTD," with ECF No. 68, collectively the "Motions").  Defendant Najeeb A. Khan waived service ostensibly under Rule 4(d)(1) but has not

---

[4] The Federal Rules of Bankruptcy Procedure are set forth in Fed. R. Bankr. P. 1001 *et seq.* and the Federal Rules of Civil Procedure are set forth in Fed. R. Civ. P. 1 *et seq.*  In the text of this opinion the court will refer to any rule simply as "Rule __," relying on the numbering conventions within each ruleset to distinguish the references.

answered or moved against the SAC.[5]   The Clerk entered his default under Rule 55(a) on February 10, 2023 (ECF No. 75).

Plaintiff opposes dismissal.

The court heard oral argument in Grand Rapids, Michigan, on April 17, 2023, and took the Motions under advisement.   For the following reasons, the court will grant Mr. Toothaker's Motion, and grant the Lake City Defendants' MTD in part, and deny it in part, as detailed below.

<u>JURISDICTION AND AUTHORITY</u>

The United States District Court for the Western District of Michigan has jurisdiction over the Debtors' bankruptcy cases under 28 U.S.C. § 1334(a), but has referred those cases, automatically, to the United States Bankruptcy Court for the Western District of Michigan pursuant to 28 U.S.C. § 157(a) and W.D. Mich. LGenR 3.1(a).  As Judge Jonker recently observed in denying the Defendants' motion to withdraw the reference, "[b]oth by local rule and policy, this Court has followed the practice of referring to the Bankruptcy Court the maximum possible authority in matters originating in a bankruptcy proceeding, including non-core adversary proceedings."  Opinion and Order of the Hon. Robert J. Jonker, dated Jan. 30, 2023 (ECF No. 72).

Many of the Plaintiff's causes of action fall squarely within what bankruptcy professionals refer to as statutory "core" proceedings, such as the claims for avoidance and recovery (or preservation) of allegedly fraudulent or preferential transfers, disallowance or subordination of claims, or other claims-related requests.  *See* SAC, Counts I - XXVI, XXXVIII - XXXIX; 28

---

[5] *See* ECF No. 62 (Najeeb A. Khan's Waiver of the Service of Summons).  Strictly speaking, Rule 4(d)(1) is not incorporated into adversary proceedings through Rule 7004, but Rule 7004(f), the spirit of the rules, and the drafters' notes contemplate waiver of service.  *See* Fed. R. Bankr. P. 7004(a) (omitting reference to Rule 4(d) generally) and (f) (countenancing personal jurisdiction when service is waived under Rule 4); *see also* Fed. R. Bankr. P. 7004, Advisory Committee Note (1996) (noting that formal waiver of service "is not applicable in adversary proceedings because it is not necessary in view of the availability of service by mail pursuant to Rule 7004(b)" but acknowledging that defendants may nevertheless waive service without waiving objections to personal jurisdiction or venue).

U.S.C. § 157(b)(2)(A), (B), (F), (H) and (O). These claims draw breath largely from chapter 5 of the Bankruptcy Code, encompassing controversies that bankruptcy courts routinely handle, even allowing for so-called "*Stern* Claims."[6] Many of the Plaintiff's claims, however, do not originate in the Bankruptcy Code, and could be asserted outside the bankruptcy setting, such as Plaintiff's claims under various state and federal laws (*e.g.*, the Uniform Fiduciary Act, state and federal racketeering statutes, and state common law). These claims deserve treatment as "non-core" proceedings. *See* SAC, Counts XXVII – XXXVII. Because the Defendants have not consented to proceeding to a final judgment before the U.S. Bankruptcy Court, the core versus non-core distinction remains meaningful in this matter.

The court acknowledges the limits on its authority and, when it comes time to dispose of the case, one way or another, with a final judgment, the court will draft a report and recommendation to the United States District Court under Rule 9033 for matters requiring that approach -- likely most of the matters asserted in the SAC.[7]

## ANALYSIS

A.  Standards Under Rule 12(b)(6)

---

[6] The Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011), held that the adjudication of certain claims falls within "the judicial power" that may be exercised only by a court with the "essential attributes" of federal judicial power prescribed in Article III of the United States Constitution, even if Congress classified the adjudication as a "core proceeding" that a Bankruptcy Court could resolve under the applicable statute. Such a claim is typically referred to as a "*Stern* claim."

[7] The Defendants have not consented to proceed before the bankruptcy court in this adversary proceeding and moved under Rule 5011 to withdraw the reference. (ECF No. 49). Although the United States District Court recently denied the Defendants' motion to withdraw the reference (ECF No. 72), the undersigned's authority to enter final judgment on many of the causes of action in this proceeding remains limited under Article III of the U.S. Constitution. Nevertheless, because an order granting a motion to dismiss under Rule 12(b)(6) as to fewer than all defendants or fewer than all claims remains interlocutory under Rule 54(b), the undersigned sees no point in preparing a report and recommendation regarding any potentially dispositive rulings at this juncture. Entry of an interlocutory order is within the bankruptcy court's authority regardless of whether the proceeding is core or non-core, in whole or in part.

The judiciary's abandonment of the more liberal standard for testing pleadings under *Conley v. Gibson*, 355 U.S. 41 (1957), in favor of a gate-keeping approach evaluating the plausibility of a claim, is by now familiar and well-established:

> In assessing a complaint for failure to state a claim, we must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation and internal quotation marks omitted).

*Ouwinga v. Benistar 419 Plan Serv., Inc.*, 694 F.3d 783, 790 (6th Cir. 2012).  The court will accept all well-pled allegations as true, but may disregard any legal conclusion "couched as a factual allegation," bare labels, or "a formulaic recitation of the elements of a cause of action."  *Iqbal*, 556 U.S. at 678 (citations omitted).  The court should not hesitate to dismiss a claim if, accepting the well-pled facts as true, the pleading nevertheless fails to state a claim upon which to grant relief.  The touchstone is now plausibility.

B.  Background

The principal protagonists in this unhappy saga are Najeeb A. Khan ("Khan") and his wholly-owned payroll services company, Interlogic Outsourcing, Inc. ("IOI").  IOI provided payroll processing services to employers around the country -- collecting funds from its customers, calculating deductions for taxes and other withholdings for the customers' employees, and remitting funds to employees (by cutting payroll checks or making direct deposits) and taxing authorities (for payroll and employment taxes).  Given the nature of IOI's business, large amounts of money passed into, and out of, IOI's accounts, daily, at several banks including defendant Lake City Bank and non-parties Berkshire Bank and KeyBank, creating the opportunities for mischief that Mr. Khan, who allegedly controlled IOI and its financial transactions, could not resist.

Indeed, without meaningful contradiction throughout these related bankruptcy proceedings, the Trustee has alleged that between 2011 and 2019, Mr. Khan masterminded "what may be the largest and longest-running check kiting case in United States history."  SAC at ¶ 1. While the scheme persisted, Mr. Khan enriched himself by misappropriating funds from IOI, its customers, and their employees, amassing a fleet of collectible motor vehicles (which the Trustee sold at auction for approximately $40,000,000.00), airplanes, yachts and other vessels, resort properties, and so much more.

The Trustee succinctly details the mechanics of Mr. Khan's check kiting scheme as follows:

> 99. Khan initiated his fraudulent check kiting scheme in or around 2011 by causing Interlogic to deposit checks drawn from Interlogic's accounts at Berkshire into the Fraud Accounts at Lake City. He would then cause checks drawn on the Fraud Accounts in comparable amounts to be deposited into Interlogic's accounts at KeyBank and would then arrange for the funds represented by those checks to be wired from KeyBank back to Berkshire to complete the circuit and ensure there were sufficient funds in the Berkshire accounts to allow the initial checks to clear.

> 100. Year-after-year, month-after-month, day-after-day, Khan caused Interlogic to deposit hundreds of sequentially numbered checks in similar, large-dollar amounts. He was not taking these checks to the bank himself; rather, Khan and certain select employees were putting them in a bag or bags and having a courier drop them off at a Lake City branch in South Bend, Indiana for deposit. And these checks were not in the thousands of dollars, but in the hundreds of thousands of dollars each, totaling on average more than $100 million a day by June of 2019.

*See* SAC at ¶¶ 99-100.

According to the SAC, Mr. Khan's audacious multi-year check kiting scheme suddenly collapsed in July 2019, when Lake City Bank, after years of covering IOI's obviously worrisome overdrafts, declined to cover the last one -- and the last one was a humdinger.  With remarkable understatement, the Trustee refers to the date that Lake City Bank informed KeyBank it would not cover the last batch of deposits (July 8, 2019) as the "Disruption Date," but it is fair to infer that

KeyBank, a regional banking giant, regarded the resulting $142,000,000 shortfall as more than merely disruptive.

KeyBank was not alone in its fateful realization following the Disruption Date: many of IOI's customers and the customers' employees eventually learned that their payroll processing company or its mastermind had embezzled funds earmarked to pay employee taxes and other obligations.

Within a month after the so-called Disruption Date, IOI and its affiliates (the IOI Debtors referred to in the SAC) filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the Northern District of Indiana.  A few months later, Mr. Khan (who lived just north of the Indiana line in Southwestern Michigan) filed voluntary petitions for himself and several related entities (the Khan Entity Debtors referred to in the SAC).  On motion, and after supervising a sale of substantially all of the IOI Debtors' assets, the judge in the Northern District of Indiana transferred those cases to the Western District of Michigan.  A little over a year after the transfer of the cases, the court confirmed a joint chapter 11 plan of liquidation for Mr. Khan, the Khan Entity Debtors, and the IOI Debtors (Base Case ECF No. 1602, the "Liquidating Plan").  The Liquidating Plan created a trust that succeeded to the property of the various debtors' estates, appointed the Trustee as Liquidating Trustee under that trust, and authorized the Trustee to continue liquidating the trust's assets for the trust's beneficiaries -- generally the creditors and others with claims against the debtors.  The Trustee filed the SAC to assert various powers under chapter 5 of the Bankruptcy Code, and to liquidate various causes of action under state and federal law, to the tune of at least $180 million, and perhaps as much as $540 million (with treble damages) if he succeeds in prosecuting counts under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and its Indiana counterpart.

The Defendants mount numerous attacks on the SAC, some general and others more tailored to particular causes of action or defendants.  The court will address the most general attacks first.

C.  Dismissal Based on *In Pari Delicto* Doctrine (Counts XXVII-XXXVII)

Each of the Defendants seeks dismissal of all federal and state law counts (other than those under chapter 5 of the Bankruptcy Code) based on the *in pari delicto* doctrine.

Indiana's Court of Appeals explains that "[t]he doctrine known by the Latin phrase *in pari delicto* literally means 'of equal fault.'"  *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. App. 1975), reh'g denied.  When a court applies the principle, it bars claims of "those who have themselves violated the law in cooperation with the defendant."  *Id.*  Elaborating further, and quoting Justice Harlan in *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 135 (1968), the Court of Appeals explained that "where the wrong of both parties is equal, the position of the defendant is stronger."  *Theye*, 337 N.E.2d at 844.[8]  Under Indiana law, "neither court of equity nor one of law will provide a remedy where such a situation is presented."  *Id.*

The SAC naturally suggests that "such a situation is presented" in this case, at least with respect to causes of action other than those under chapter 5 of the Bankruptcy Code, because each claim is premised on a check kiting scheme in which the Trustee's predecessors in interest (mostly Mr. Khan and IOI) played the starring roles by uttering and depositing the very checks at issue. Initially, the application of the *in pari delicto* doctrine has considerable appeal in this matter.

Like most judge-made law, however, other judges have made exceptions, and still others have made exceptions to the exceptions, resulting in a very fact-dependent, herky-jerky doctrine

---

[8] The doctrine is state specific and here that state is Indiana, as the parties agreed during oral argument.  *See* Transcript of Hearing Held April 17, 2023 (hereinafter "Tr.") at 65:9-16.

as applied to corporate plaintiffs.  Here, for example, in response to the Defendants' invocation of the doctrine, the Trustee argues that the law recognizes the "adverse interest" exception to make the doctrine inapplicable when, in effect, a corporation has been hijacked by corporate actors with interests adverse to the corporation.  *Mid-Continent Paper Converters, Inc. v. Brady, Ware & Schoenfeld, Inc.*, 715 N.E.2d 906, 909 (Ind. Ct. App. 1999) ("An agent's knowledge will not be imputed to the principal, where the agent's conduct raises a presumption that the agent would not communicate his knowledge," quoting *Vincennes Savings & Loan Ass'n v. St. John*, 12 N.E.2d 127, 130 (Ind. 1938)).  The Trustee, naturally, points to Mr. Khan as the mastermind of the check kiting scheme and the one who is alleged to have looted his company's coffers.  Objection to Defendants' Motion to Dismiss (ECF No. 73, hereinafter "Trustee's Resp. to Lake City Defendants' MTD") at pp. 20-21.  The Defendants, for their part, are quick to raise the "sole actor" exception (or corollary) to the adverse interest exception, which applies when the corporate villain wholly owned and controlled the plaintiff-corporation.  *Cantrell v. Putnam Cnty. Sheriff's Dep't*, 894 N.E.2d 1081, 1087 (Ind. Ct. App. 2008) (recognizing the "sole actor" exception).  In such a case, the villain's bad intent is imputed to the company, making the company a bad actor (suggesting *in pari delicto*) once again.  But wait, a final caveat may come into play if, notwithstanding the supposed dominance of the 100% owner, there is someone in the company -- an innocent insider -- who might have stopped the corporation from committing the bad acts that gave rise to the *in pari delicto* concerns in the first place.[9]

Here, the Trustee's lawyers seem to have anticipated all of this -- especially the final caveat -- by alleging that Mr. Khan kept his remarkable financial finagling under wraps, specifically

---

[9] The Defendants stated at oral argument that Indiana does not recognize this final exception to the exception to the exception.  *See* Tr. at 75:9-16.

hiding his misdeeds from Chief Financial Officer Paul Witek and Vice President of Operations, Paul McCormick, who would have cut the kite strings, had Mr. Khan not been so adept at hiding his scheme from them.  SAC at ¶¶ 84, 118-20.

As compelling as the *in pari delicto* defense seems at first blush (given Mr. Khan's and IOI's crucial roles in the kite scheme), the court cannot apply it at this stage of the proceedings for several, mainly procedural, reasons.

First, the description of the doctrine in the case law, including from Indiana, suggests that applying the doctrine requires the court to weigh or balance fault, an inherently factual exercise ill-suited to a motion addressed to the pleadings.  Applying the doctrine to bar claims requires the court to conclude that the plaintiff was at least equally at fault with the defendant.  The present record does not permit that sort of comparison at this time.  *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *9 (S.D. Ind. Mar. 24, 2004) ("*in pari delicto* is an affirmative defense and generally dependent on the facts, and so often not an appropriate basis for dismissal," quoting *Knauer v. Jonathon Roberts Financial Group, Inc.*, 348 F.3d 234, 237 n. 6 (7th Cir. 2003)).

Second, the exceptions and exceptions to exceptions to the *in pari delicto* doctrine generally address whether or to what extent an agent's motive or scienter is to be imputed to the plaintiff or its predecessor in interest.  For example, the "adverse interest" exception would bar the doctrine if Mr. Khan's motives and interests diverged from IOIs, which they certainly did as he embezzled, but maybe not as he played the float for IOI.  And, assuming *arguendo* the viability of the "innocent insider" exception, the Trustee's allegations about Messrs. Witek and McCormick undercut the efficacy of the defense.  Intent, and the imputation of intent, are inherently fact-bound concerns, as are the roles that the "innocent insiders" may have played.  And, as Trustee's counsel

noted during oral argument, basic principles of federal civil procedure absolve him from pleading facts necessary to defeat an affirmative defense, such as *in pari delicto*. *Bash v. Textron Fin. Corp. (In re Fair Finance Co.)*, 834 F.3d 651, 678 (6th Cir. 2016). Moreover, as noted below, the SAC does not itself conclusively establish the defense, contrary to the Defendants' suggestions.

Third, the Indiana Supreme Court cited approvingly the Seventh Circuit's decision in *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995), for the notion that where, as here, the wrongdoer is removed, the reason for applying the *in pari delicto* defense diminishes. *Ispcom LLC v. Theising*, 805 N.E.2d 767 (Ind. 2004). It is not entirely clear, at this juncture, whether (or how vigorously) the courts of Indiana would apply the doctrine against a trustee who, like the receiver in *Ispcom, LLC*, has displaced the bad actor. Therefore, before the court relies on Indiana law to bar the lion's share of the Trustee's causes of action, it will insist on a more robust explication of the defense as applied in the Hoosier state.

To summarize, while it is true that a person sued by a trustee in bankruptcy may assert the *in pari delicto* defense against an estate's non-bankruptcy claims if the jurisdiction whose law creates the claims permits the defense outside of bankruptcy, *Terlecky v. Hurd (In re Dublin Securities, Inc.)*, 133 F.3d 377, 380–81 (6th Cir. 1997), the court need not apply the doctrine at the earliest stages of a proceeding on an inadequate record, even if the defense seems eminently plausible or well-suited to the matter. Accordingly, for now, the court rejects the Defendants' *in pari delicto* arguments as premature.

D. <u>Dismissal Based on Rule 9(b)'s Specificity Requirement Regarding Overdraft Fees and Diverted Funds</u>

The Defendants argue that the Trustee has failed to plead his fraud-related claims with particularity, including with respect to the Overdraft Fees[10] and the Diverted Funds, criticizing the allegations as deficient because they lump the various debtors into a single entity (*e.g.*, IOI or the IOI Debtors), then allege that the group (so defined) made transfers in an aggregate amount. They cite decisions in which this court required a trustee-plaintiff to allege the "specific components" of a fraudulent transfer. *In re Great Lakes Comnet, Inc.*, 588 B.R. 1, 21 (Bankr. W.D. Mich. 2018); *see also Moyer v. Koster (In re Przybysz)*, Adv. No. 12-80174-swd, slip op. (Bankr. W.D. Mich. Sept. 25, 2012).

The court notes, however, as the Trustee has, that it must read Rule 9's specificity requirement together with Rule 8 and the general requirements of notice pleading, so as not to return the parties to the procedural Stone Age. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466–67 (6th Cir. 2011). Moreover, the main purpose of Rule 9(b) -- "to alert defendants 'as to the particulars of their alleged misconduct'" and "protect defendants' reputations from allegations of fraud," is not served by strictly applying the rule to allegations under 11 U.S.C. § 548(a)(1)(A)[11] and state counterparts because these statutes make the *transferor's* intent to defraud material; the transferee's intent plays no part in making a *prima facie* case. *See, e.g.*, 11 U.S.C. § 548(a)(1)(A) (targeting transfers or obligations that "the debtor voluntarily or involuntarily . . . made . . . with actual intent to … defraud any entity …").[12] As for preventing a "fishing expedition," the Trustee

---

[10] Plaintiff refers to the alleged $13.6 million in overdraft charges as the "Fraudulently Transferred Fees," presumably to reinforce his point. The court will instead refer to the fees as the "Overdraft Fees," a less-loaded term for the charges.

[11] The Bankruptcy Code is set forth in 11 U.S.C. §§ 101 *et seq*. In this opinion., specific sections of the Code are identified herein as "§ ___."

[12] The court acknowledges that it has applied Rule 9(b) to claims under § 548(a)(1)(A) but wonders why allegations involving the very same transfers suffice, if challenged under § 548(a)(1)(B). The parties have not challenged the applicability of Rule 9(b) here, so the court has no occasion to reconsider the role of that rule in avoidance litigation involving actual fraudulent (as opposed to constructive fraudulent) intent.

has already conducted a wide-ranging investigation which the court authorized under Rule 2004. Going forward, Rule 26 certainly puts arrows in the court's quiver to curb discovery abuses in the adversary proceeding.

As to the Diverted Funds, the Trustee's explanation in his response brief offers his theory of claim and identifies the incurrence of the obligations associated with the provisional intra-day credits predating each of the transfers listed in Exhibit B to the SAC, as well as the satisfaction of those obligations (as "good" funds hit the accounts the next day, in the regular cycle of Mr. Khan's kiting scheme).  Trustee's Resp. to Lake City Defendants' MTD at pp. 5-6.  The Trustee contends that this gives the Defendants notice of the particulars of the Trustee's claim with respect to the Diverted Funds.  At oral argument, the Defendants emphasized that the Diverted Funds -- funds flowing not *to* the Defendant but *from* IOI's deposit accounts to accounts owned or controlled by Mr. Khan -- represent a small fraction of the daily deposits, making it impossible to determine with precision which of the deposits into the IOI accounts were made with actual intent to defraud. The court is not so certain that the Trustee's explanation affords notice of the transfers given the sheer volume of funds flowing into the accounts each day (SAC at Exh. A) compared to the Diverted Funds (SAC at Exh. B), but it need not reach the issue with respect to the Diverted Funds because those transactions do not qualify as "transfers," as explained below.  *See infra* p. 24.

Recognizing that § 548 and the Uniform Voidable Transactions Act permit invalidation of obligations as well as transfers, in Counts IX-XII regarding the "Lake City Loans" the Trustee seeks both forms of relief -- avoidance of the loans (or "obligations") and avoidance of the payments made on account of the Lake City Loans (the "transfers").  The Trustee also seeks to avoid the Khan Guaranty (Counts XIII and XV) for similar reasons.  To the extent the proposed avoidance of these obligations and transfers depends on allegations of fraudulent intent, Rule 9(b)

requires the Trustee to state the claim with particularity, to give specifics as to the identity of the transferor, dates of the transfers, etc. The Defendants argue that after three different iterations of his complaint, the Trustee has struck out under Rule 9(b) with respect to the counts related to the Lake City Loans and the Khan Guaranty. The court, however, believes the Trustee is batting at least .500.

The complaint leaves no room for doubt about the specifics surrounding the incurrence of the Lake City Loans (defined to include the KRW Loan and three other loans to IOI and Lakeview Technologies). *See* SAC at ¶ 116 (Lake City Loans). With respect to each of the purported obligations, the SAC identifies the debtor-obligor, dates of the obligations, and related documents, leaving nothing to the imagination. These SAC counts could hardly be more specific. The same goes for the Khan Guaranty and the KRW Mortgage. SAC at ¶¶ 42-45, 258-60, 276, 292, 300-01, 305-06, 426-31, 438-43.[13] If Lake City's records are sufficient to enable the bank to file a proof of claim based on these obligations, the Defendants unquestionably have sufficient notice of the claims, and should be amply prepared to defend the allegations challenging the basis of their claim, even against an attack premised on IOI's supposed fraud. The SAC states a claim for avoidance of the various obligations as the product of actual intent to defraud.

The payments on account of these obligations, however, remain obscure by Rule 9(b) standards, largely because the Trustee lumps the debtor-transferors together, somehow as a collective transferor, and also because the Trustee has not identified specific transfers on account of the loans. For example, the following paragraph represents the Trustee's attempt at identifying the payments made on account of the Lake City Loans:

---

[13] Strictly speaking, the KRW Mortgage is a transfer of an interest in real estate rather than an obligation, described with more than enough specificity to survive a challenge under Rule 9(b).

> The transfers of payments from the Debtors for their loans to Lake City and the proceeds of any Lake City Loan to Khan or one of his entities each transferred an interest in property belonging to one of the Debtors to or for the benefit of Lake City and Khan.

SAC at ¶ 398. The SAC defines the term "Debtors" broadly to include the "IOI Debtors" (consisting of seven entities), the Khan Entity Debtors (six entities), and Mr. Khan himself. *See* SAC at p. 1, n. 1 (identifying debtors) and ¶ 56 (defining "IOI Debtors"). Under persuasive, local caselaw, a trustee seeking to avoid transfers on an "actual fraud" theory -- even in jointly administered cases -- must identify which of the several debtors made the challenged transfer, at least in the absence of an order substantively consolidating the estates. *In re NM Holdings Co., LLC*, 407 B.R. 232, 261 (Bankr. E.D. Mich. 2009) ("In order to meet [the Rule 9(b)] requirement in [the actual fraud] context, a plaintiff must allege . . . the name of the transferor . . . ."); *In re Great Lakes Comnet, Inc.*, 588 B.R. at 21 (recognizing *NM Holdings Co., LLC, supra,* as good law). Here, the IOI Debtors, the Khan Entity Debtors, and Mr. Khan have not been substantively consolidated. Indeed, during oral argument, when the court inquired about the extent to which the Liquidating Plan consolidated these entities, counsel responded "only for payment and distribution." Tr. at 126:21-23. So, the Trustee's collective reference to "the Debtors" as transferors (as in SAC ¶ 56) fails to identify a specific transferor. Moreover, as is clear from the SAC at ¶ 398, the Trustee refers only generally to "payments from the Debtors," not to any particular payments by date or amount, for example. And, to say that each of the Debtors "transferred an interest in property belonging to one of the Debtors," certainly does not pass muster under Rule 9(b) as applied in this context.

As a result, the court will deny the Motion to the extent it seeks to dismiss counts challenging the incurrence of the various obligations (Lake City Loans, Khan Guaranty, etc.), but

grant the Motion to the extent it seeks to avoid (and therefore, recover) *transfers* made on account of those obligations.[14]

The Defendants' argument regarding the specificity of allegations challenging the Overdraft Fees is much less compelling than its attack on the Diverted Funds, again keeping in mind (1) the continuing vitality of Rule 8 and (2) the likelihood that a sophisticated, regulated financial institution like Lake City Bank has knowledge of the overdraft charges that its former customers paid. These factors tip the scales against granting the Motion on this point. Lake City Bank can hardly contend that it lacks notice of the specifics of the fees it charged its star customer sufficient to frame a defense to the SAC.

More specifically, the Trustee has identified three "fraud accounts" by account number (using terminal digits), and the owners of those accounts. SAC at ¶ 87 (table 1). Admittedly, references to Mr. Khan's "endless transfers" to support the multi-year check kiting scheme muddles the allegation, but a sophisticated financial institution should have no difficulty framing a defense given the specific account numbers and date range provided. Indeed, "[c]ourts have held that the rule [9(b)] may be relaxed where information is only within the opposing party's knowledge." *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988). The court will not undermine this principle simply because the Trustee availed himself of pre-suit discovery under Rule 2004, as the Bankruptcy Code, the rules, and the court allowed.[15]

---

[14] The court can imagine other theories of claim to recover payments made on a void obligation, but the Trustee's current theories premised on chapter 5 avoidance powers cannot survive the Motion. A plaintiff is the master of his complaint, *Warthman v. Genoa Twp. Bd. of Trustees*, 549 F.3d 1055, 1063 (6th Cir. 2008), and this maxim applies with special vigor to one as sophisticated and well-counseled as the Trustee.

[15] In his brief, the Trustee misquoted the *Michaels Bldg. Co.* decision, but Defense counsel graciously ascribed no bad motive to the misstep, even while arguing that the Trustee has benefited from pre-suit investigation. Tr. at 30:25 – 32:24.

The policies undergirding Rule 9 as set forth in *Chesbrough,* and *Chesbrough*'s admonition that Rule 8 applies even in cases alleging fraud, leads the court to conclude that the SAC counts targeting the Overdraft Fees satisfy Rule 9(b)'s particularity standard.

E.   Dismissal of Claims Against Bradley Toothaker

The SAC asserts four counts against Bradley Toothaker (Counts XXXII - XXXV), and in response he piggybacks on many of the same arguments that the Lake City Defendants advance in support of dismissal.  In addition to his shared arguments, he emphasizes the more remote role that he played at Lake City as an outside director, rather than an officer with day-to-day duties.  More to the point under Rule 12(b)(6), he contends that, aside from conclusory allegations of a "corrupt" relationship and "irreconcilable" conflicts with Mr. Kahn, the SAC makes no specific allegations of any actions on his part plausibly connecting him to the transactions at issue in this adversary proceeding.  The court agrees.

Moreover, his briefing persuades the court that, as a director of Lake City Bank, Mr. Toothaker's duty ran to the bank, not to the bank's customers.  Indeed, the Plaintiff's own pleading seems to concede the point.  For example, the SAC states that Mr. Toothaker's conflict of interest "was a breach of Mr. Toothaker's duty of care and loyalty to Lake City, impairing his ability to review and discuss the Bank's major financial risk exposures as required by the positions that he held."   SAC at ¶ 223; *id.* at ¶ 36 (Mr. Toothaker's "obvious conflicts of interests made him incapable of identifying and enforcing the very compliance policies that are intended to prevent, deter, and *protect the Bank and its shareholders* from the types of illicit activities in which the Core Group and Khan were involved.") (emphasis added).  There is nothing in the record to persuade or even permit the court to extend a bank director's fiduciary duties to the bank's

customers.  This applies equally to Mr. Toothaker's supposed duty of good faith and ordinary care (Counts XXXII and XXXIII), both of which run to Lake City, not IOI.

As for Count XXXIV, alleging that Mr. Toothaker "aided and abetted" Mr. Khan's breach of fiduciary duty to the IOI debtors, the court is not persuaded that Indiana recognizes such a cause of action.  *Crystal Valley Sales, Inc. v. Anderson*, 22 N.E.3d 646, 648 (Ind. Ct. App. 2014); *DiMaggio v. Rosario*, 950 N.E.2d 1272, 1274 (Ind. Ct. App. 2011).  The Indiana Court of Appeals expressed its qualms about recognizing the very cause of action at issue in Count XXXIV when it stated that "the decision to adopt a new cause of action for aiding and abetting in the breach of fiduciary duty is a decision better left to the legislature or our supreme court." *Crystal Valley Sales, Inc.*, 22 N.E.3d at 656.  In the nearly ten years since that utterance, neither branch of Indiana government has done so.  Moreover, the Sixth Circuit teaches that intermediate state appellate court decisions are persuasive indicators of state law, absent a showing of inconsistency with the state's highest tribunal.  *In re Fair Finance Co.*, 834 F.3d at 671 (federal courts may consider intermediate state appellate court decision when making the *Erie* guess).  The court perceives no such inconsistency.  The fact that a federal district court in Indiana issued an unpublished opinion predicting the expansion of the cause of action ten years before the decision in *Crystal Valley Sales*,[16] though noteworthy, is not sufficiently persuasive.

Finally, with respect to Count XXXV (Conversion), the absence of allegations specifically tying Mr. Toothaker to the "Diverted Funds" dooms that count, even after the Plaintiff clarified

---

[16] *See Baker O'Neal Holdings, Inc.*, 2004 WL 771230, at *12-13. This conclusion applies equally to the comparable "aiding and abetting" counts against the other Defendants.

his theory in response to Mr. Toothaker's UCC-based arguments.[17]   Whereas the SAC clearly describes the day-to-day involvement of Mr. Findlay and others in the Core Group, the SAC omits comparable allegations against Mr. Toothaker.  The court agrees with Mr. Toothaker's observation that "other than labels and conclusory allegations that Mr. Toothaker knowingly or intentionally aided Mr. Khan in his fraud – the SAC does not plead any facts supporting same."  Brief in Support of Motion to Dismiss (ECF No. 69) at p. 10.

The court will dismiss all counts against Mr. Toothaker for Plaintiff's failure to state a plausible claim for relief.

F.   Dismissal of Claims Against Lakeland Financial

The SAC makes no specific allegations that Lakeland -- the bank holding company -- was involved in any of the activities giving rise to the Trustee's numerous allegations, let alone plausible allegations.  In response to the Lake City Defendants' MTD as it relates to Lakeland, the Trustee does nothing to flesh out or assist the court in understanding why or how he has a plausible right to relief against the parent company, other than the fact that Lake City Bank is Lakeland's wholly-owned subsidiary and they share some officials.  As a matter of law, however, the parent-subsidiary relationship, without more, will not suffice to impose liability on Lakeland.[18]

This follows from a bedrock corporate principle, including in Indiana, that "distinct corporations, even parent and subsidiary corporations, are presumed separate," and parent companies are generally not liable for the acts of subsidiaries.  *Greater Hammond Cmty. Servs.,*

---

[17] In response to Mr. Toothaker's brief, the Plaintiff clarified that Count XXXV does not allege Lake City converted IOI's property, but that "Khan converted IOI property and Lake City, the Core Group, and Toothaker knowingly and intentionally aided and abetted Khan's conversion."  Objection to Defendant Toothaker's Motion to Dismiss (ECF No. 74) at p. 2.

[18] In his response to the motion, the Trustee concedes that he did not intend to assert avoidance counts against Lakeland (Counts I-XXII).  *See* Trustee's Resp. to Lake City Defendants' MTD at p. 32.

*Inc. v. Mutka*, 735 N.E.2d 780, 784 (Ind. 2000) (citing William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations §§ 41.10, 43, at 568, 711 (1999) and *McQuade v. Draw Tite, Inc.*, 659 N.E.2d 1016, 1020 (Ind. 1995)); *see also Boston Sci. Corp. v. Cook Grp. Inc.*, No. 117-CV-03448 (JRS-MJD), 2023 WL 1452172, at *28 (S.D. Ind. Jan. 31, 2023).

At oral argument, the Trustee reiterated his point that Lakeland and Lake City Bank have some common officers or directors, but the mere fact of overlapping officials (SAC at ¶ 270) does not change the equation. *O'Brien v. Watco Cont. Switching, Inc.*, 802 N.E.2d 999, 1007–08 (Ind. Ct. App. 2004) ("corporate ownership of a subsidiary and overlapping offices and directorates are not, without more, sufficient to impose liability on the parent for conduct of the subsidiary under a statute that does not itself pierce the corporate veil.").

In effect, the Trustee is seeking to pierce the corporate veil, but to do so, he must prove "[1] that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and [2] that the misuse of the corporate form would constitute a fraud or promote injustice." *Reed v. Reid*, 980 N.E.2d 277, 301 (Ind. 2012) (citation omitted). The SAC makes no allegations of Lakeland's supposed dominance or disregard of corporate formalities, and in fact, the Trustee alleges that the individual defendants, especially in the Core Group, concealed from Lakeland the bank's (and their own) role in the allegedly illicit transactions. *See* SAC at ¶¶ 24, 574-78, 580, 590-94, 596, 606-10, 612, 616-17, 625. There is no plausible basis in the SAC for piercing Lake City Bank's corporate veil. Allegations of misfeasance by the bank and its agents, without more, will not suffice to cross the plausibility threshold which the court regards as necessary to tag the parent company for its subsidiary's alleged misdeeds under *Iqbal* and *Twombley, supra*.

Therefore, at an appropriate time the court will recommend that the District Court enter a final judgment dismissing Lakeland (Counts I - XXVIII, XXX - XXXV, XXXVII - XXXVIX). *See* Fed. R. Civ. P. 54(b).

G. Dismissal Based on Failure to Properly Plead Constructive Fraudulent Transfers With Respect to the Overdraft Fees, the Lake City Loans, the KRW Loan, the KRW Mortgage, and the Khan Guaranty

The Defendants contend that the Trustee's constructive fraudulent transfer claims fail for two reasons. First, they argue that the SAC does not allege a lack of reasonably equivalent value and second, they assert that the SAC lacks specificity, largely repeating the arguments they directed at the actual fraudulent transfer claims.

As explained above, there is no heightened pleading standard for allegations of constructive fraudulent transfers and traditional litigation tools exist to assist the court and the parties in elucidating the "short and plain statement of the claim" that Rule 8(a)(2) requires. Ironically, by arguing that the Trustee's pleading will invite substantial discovery (Lake City Defendants' MTD at p. 18), Lake City itself acknowledges these litigation tools, endorsing Judge Tucker's rationale in the second of his *NM Holdings* decisions: "Defendants could seek full details about the transfers in discovery." *Gold v. Holding Co., LLC (In re NM Holdings Co., LLC)*, 376 B.R. 194, 204 (Bankr. E.D. Mich. 2007).

More persuasively, the Defendants also argue that any payment that IOI made on account of its obligations to LCB resulted, *ipso jure*,[19] in a corresponding receipt of reasonably equivalent value, as it was a "dollar-for-dollar reduction in debt." *Southeast Waffles, LLC v. U.S. Dept. of Treasury (In re Southeast Waffles, LLC)*, 702 F.3d 850, 857 (6th Cir. 2012); 11 U.S.C. §

---

[19] These obligations include the Lake City Loans identified in the SAC at ¶ 116. It only seems fair to limit the court's consideration to the loans listed, ignoring the expansive qualifier that the loans "include, but are not limited to" those identified in the paragraph.

548(d)(2)(A) (defining value to include satisfaction of debt).  The argument carries the day, however, only to the extent that a debtor makes payment on account of its own (as opposed to an affiliate's) obligation, which remains unclear at the pleading stage.  A debtor who satisfies its own obligation receives reasonably equivalent value but one who pays the obligation of another may not.

The same observation applies to the Overdraft Fees and any payments on account of the Lake City Loans.  The court cannot accept the defense in its entirety without a more developed record.

Regarding the Khan Guaranty, the Defendants did not develop any meaningful argument against avoidance, due to constructive fraud, either in their brief or at oral argument, other than the lack of specificity in pleading, which the court rejects.  Lake City Defendants' MTD at pp. 17-18; Lake City Defendants' Reply to Trustee's Objection to Defendants' Motion to Dismiss Second Amended Complaint (ECF No. 79, hereinafter "Lake City Defendants' Reply to Trustee's Response") at p. 6.  Like the Trustee, the court does not understand how these allegations are unclear to the Lake City Defendants.  Trustee's Resp. to Lake City Defendants' MTD at p. 9.  Although it is difficult to perceive any *bona fide* value that Mr. Khan received in exchange for inking the Khan Guaranty, the issue remains for another day, given the Defendants' undeveloped challenge at this point in the litigation.

With respect to the Diverted Funds and the KRW Loan, however, the Motion has considerably more traction.

As for the Diverted Funds, the Trustee's conception of the transfer as the payment of the intraday provisional credit precludes relief for two reasons.  The Trustee theorizes that IOI (or one of its affiliates) effected a transfer when, in the ordinary course of Mr. Khan's extraordinary check

kiting scheme, new checks rolled into the Lake City Deposit accounts from Berkshire Bank to pay off or retire the intraday provisional credit (allegedly after Mr. Khan embezzled the proceeds of the provisional credit by directing funds to himself and companies he controlled).  Understood in this way, the Trustee is dissecting the deposit and check-clearing process in a manner that, the court believes, contravenes the Sixth Circuit's conclusion that a deposit is not a transfer.  *See infra* pp. 24-28 (discussing *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017)).  Moreover, even assuming it is appropriate to parse the deposit transaction as the Trustee proposes in the fraudulent conveyance counts, Lake City gave value by its "dollar-for-dollar reduction in debt" -- *i.e.*, when it cleared or treated as paid the prior day's provisional credit.  *Southeast Waffles*, 702 F.3d at 857.

As for the KRW Loan, the SAC alleges that Lake City funded a $1.4 million loan in the name of KRW, the proceeds of which KRW deposited into an account in KRW's name.  *See* SAC at ¶¶ 113-14.  These allegations, accepted as true, establish that Lake City gave value to KRW in exchange for the KRW Loan, which it naturally secured with the KRW Mortgage.  The allegation that "Khan took the KRW loan proceeds and transferred them to himself or other entities for his own personal benefit," SAC at ¶ 111, does not plausibly expose Lake City to any liability on account of a constructively fraudulent transfer.  The Motion with respect to Count XVIII is well-taken.

H.  Dismissal of Claims Related to Deposit Transactions

With the exception of the Overdraft Fees, most of the supposed transfers (Counts V-VIII) relate directly to the check kite and involve a bank deposit transaction, which is not surprising given the central role that check kiting plays in this dispute.  The Defendants seize on this point, arguing with good authority that courts will not recognize a "transfer" within the meaning of §

101(54) when a debtor deposits funds into its own bank account.  The notion is this: even though, under state law, the depositor parts with title to the deposited funds and receives in exchange a claim against the depository,[20] for chapter 5 purposes bankruptcy courts generally hold that the depositor retains dominion and control over the deposited funds and that title to the funds does not pass to the depository.  This means that a bank deposit does not effect a transfer.  The principal case in our circuit on this point is *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017).

*Meoli*, a case arising from another remarkable fraud scheme originating in our district, did not involve check kiting, but it certainly involved fraudulent bank deposits.  The Ponzi schemer in that case, through entities referred to as "Cyberco" and "Teleservices," deceived numerous equipment lessors and other lenders into financing non-existent computer equipment, using the proceeds of one transaction to pay off earlier dupes, all in a recurring cycle designed to keep the lenders and lessors in the dark about their fictitious collateral or equipment.  To do so, Cyberco funneled millions of dollars through its deposit accounts at Huntington National Bank, which also served as its lender.  The bank applied some portion of the fraud proceeds to reduce Cyberco's debt to the bank, but some portion remained in the account after the bank took its share.  The Sixth Circuit referred to the portion that remained in the accounts after the bank paid itself as the "Excess Deposits," drawing an important distinction that, the Trustee contends, supports his theory of claim against the Defendants.  Ponzi schemes, like check kites, do not last forever, and when Cyberco's ruse finally collapsed, the company landed in bankruptcy court where the bankruptcy trustee sued Huntington to recover the deposits resulting from Cyberco's fraud.

---

[20] *In re Quality Health Care*, 215 B.R. 543, 561 (Bankr. N.D. Ind. 1997), appeal denied, cause remanded sub nom. *Gouveia v. I.R.S.*, 228 B.R. 412 (N.D. Ind. 1998) ("The relationship between a bank and a depositor is ordinarily that of debtor and creditor.").

The Sixth Circuit in *Meoli* acknowledged that the funds the debtor deposited and that Huntington applied to reduce Cyberco's debts qualified as "transfers" because the bank exercised dominion and control to the extent it paid down the depositor's debt. *Meoli*, 843 F.3d at 725 (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 894 (7th Cir. 1988) for this proposition) and 843 F.3d at 729 (finding that Huntington was a transferee with respect to direct and indirect loan payments funneled through the accounts).

With respect to the "Excess Deposits" in that case, however, the Sixth Circuit refused to find a transfer when a depositor makes an ordinary deposit into its own account. As a result, the Cyberco trustee could avoid (and recover) the funds that Huntington used to pay down the independent line of credit -- debts unrelated to the deposit account itself -- but could not avoid or recover the funds that the fraudster simply deposited. Moving money from one of the debtor's pockets into another is not a transfer because the depository does not exercise dominion and control over its depositor's account sufficient to treat the deposit itself as a transfer. Holding otherwise, the Sixth Circuit teaches, would do violence to the banking system and public policies involving funds availability.

The Trustee counters that, unlike *Meoli*, the present case does not involve ordinary deposits, but involves the actions of Lake City Bank and its confederates in extending massive amounts of credit -- provisional credit in the parlance of banking -- immediately after Mr. Khan made each of IOI's deposits. The Trustee's theory is that just as Huntington applied good funds in Cyberco's account to reduce the depositor's debt, Lake City applied the funds from the later kited checks to retire the provisional credit -- to pay itself just as Huntington did.

The *Meoli* court's refusal to treat the deposits as transfers, however, cannot be distinguished on the grounds the Trustee offers, namely that Lake City Bank's alleged collaboration with Mr.

Khan removes the deposit transactions from the realm of "ordinary" deposits.  The Sixth Circuit in *Meoli* was well-aware of Huntington's complicity -- it rejected the bank's good faith defense under § 548(c) -- but refused to recognize any deposits as transfers, despite the trustee's argument that "Cyberco's was not a typical deposit account," presumably due to the pervasive fraud.  *Meoli*, 848 F.3d at 727.  The difference between the depository's conduct in *Meoli* and Lake City Bank's behavior in the present case is a matter of degree, not kind.

At oral argument, the court and the parties discussed the effect of the Sixth Circuit's decision in *McLemore v. Third Nat'l Bank (In re Montgomery)*, 983 F.2d 1389 (6th Cir. 1993), a preference case involving a check kiting scheme.  Tr. at 20, 47.  The decision, although in tension with *Meoli*,[21] is distinguishable.  First, as Trustee's counsel repeatedly argued, *Montgomery* involved a preference claim, rather than a fraudulent transfer claim.  Second, *Montgomery* involved "overdrafts" -- shortfalls in the deposit account that spanned several days -- as opposed to the "intraday provisional credits" at issue here.  *See* Tr. at 21:15-18, 35:23 – 36:21, 37:9-12, 41:14-19 (drawing distinction between intraday provisional credits and inter-day overdrafts).

Moreover, the focus of the Sixth Circuit's analysis in *Montgomery* and *Meoli* differed considerably, perhaps also justifying the different conclusions in these admittedly difficult-to-reconcile decisions.  The *Montgomery* court emphasized the degree of control that the depositor exercised over the provisional credit to determine that he had a property interest in the ill-gotten gains of the check kiting scheme; the *Meoli* court addressed the degree of control that a depository bank had over the deposit account.  *Compare Montgomery*, 983 F.2d at 1395 (evaluating the

---

[21] The court acknowledges that the panel in *Cyberco* did not overrule *Montgomery*.  6 Cir. R. 32.1 (one panel will generally not overrule an earlier panel's decision).  The court, therefore, must do its best to give effect to both.

depositor's control over the provisional credit in the account) *with Meoli*, 848 F.3d at 724-26 (evaluating the depository bank's control over the deposit account itself).

The thrust of the *Meoli* court's decision, and decisions such as *Bonded Fin. Servs.* and others, is that, as a matter of law, banks lack the sort of dominion and control over deposit accounts sufficient to recognize a deposit as a transfer.  Significantly, by favorably citing *Bonded Fin. Servs.*, it is fair to infer that the Sixth Circuit in *Meoli*, like the Seventh in *Bonded Fin. Servs.*, had in mind serious systemic concerns about the financial system, including the "staggering costs" for the check-clearing system that would result from treating a deposit as a "transfer."  *Meoli*, 848 F.3d at 725-26 (citing *Bonded Fin. Servs., Inc.*, 838 F.2d at 893).  The Sixth Circuit in *First Tennessee Bank v. Stevenson (In re Cannon)*, 237 F.3d 716 (6th Cir. 2001)*,* was more explicit about its systemic concerns implicated in applying avoidance law to deposit transactions:

> The Trustee's position, by implication, would transfer every single conditional credit into an unsecured debt, avoidable as a preferential transfer. The result would lead to a bankruptcy decision effectively circumventing the current check clearing system set up by Article 4 and federal banking laws, especially the requirement of expedited funds availability under Regulation CC. *See* 12 C.F.R. § 229.1 (2000).

*Cannon*, 237 F.3d at 721.  Reading *Cannon* and *Meoli* together, the court rejects the Trustee's implicit request to divide the unitary deposit transaction into discrete parts (the provisional credit and the next-day deposit that retires the credit), notwithstanding the extraordinary fraud alleged and Lake City's supposedly willful participation in it.[22]  Lake City Bank's alleged shortcomings in its deposit monitoring are better addressed by a bank regulator, not a bankruptcy judge, given the appellate courts' systemic concerns.

---

[22] The obligation related to the Overdraft Fees is related to the deposit accounts, for sure, but separate from the check-clearing process itself.  The distinction is akin to the one the Sixth Circuit drew in *Meoli* between the "Excess Deposits" and the direct and indirect payments on the separate loan.

I.   Dismissal of the Preference Claim

Striking a theme similar to their attack on the fraudulent conveyance counts, the Defendants also challenge the specificity of the transfers at issue in the preference count (Count XXI), albeit under Rule 8 rather than Rule 9(b).  The question is whether the allegations supporting the preference count give fair notice under the more liberal "notice pleading" generally applicable to federal complaints.  *NM Holdings Co.*, 376 B.R. at 203-04.

In its brief, and at oral argument, Lake City argues that the SAC "fails to identify the specific debtor/transferor of any allegedly preferential transfer, instead using the defined terms 'IOI Debtors' and 'Debtors' to describe the debtor/transferor in Count XXI."  Lake City Defendants' MTD at p. 19.  The preference allegations are indeed broad and non-specific:

> The transfers of the Fraudulently Transferred Fees, payments made by or on behalf of the IOI Debtors on the Lake City Loans, and all payments made by one or more of the Debtors to Lake City within 90 days of such Debtor's Petition Date was a transfer of an interest in property belonging to one of the Debtors and were for or on account of an antecedent debt owing by the Debtors to Lake City, including liability for the Lake City Loans.

SAC at ¶ 481.  At first blush, aggregating the supposed transferors using the defined terms "IOI Debtors" or "Debtors" seems inconsistent with Judge Tucker's approach in *NM Holdings Co.*  It is true that Judge Tucker declined to dismiss the complaint in that case, finding that the pleading identified "(1) the name of each debtor/transferor; (2) the name of each defendant/transferee; (3) the form of transfers (checks); and (4) the total amount of the alleged preferential transfers made by a particular debtor/transferor to each defendant/transferee."  *Id.*, 376 B.R. at 204.  Yet, he did not opine that Rule 8(a) required that level of specificity, only that the pleading before him provided it.  To the extent the Defendants read *NM Holdings* as requiring the information that, say,

some bankruptcy courts in Delaware might require,[23] they overread Judge Tucker's decision. Indeed, he specifically rejected any heightened pleading standard for preference cases, and cited approvingly another Delaware decision, *IT Group v. Brandywine Apts. (In re IT Group)*, 313 B.R. 370 (Bankr. D. Del. 2004), which criticized *Valley Media* as "unnecessarily harsh." *NM Holdings*, 376 B.R. at 204.

To some extent, the SAC is more specific than the paragraph just quoted suggests. For example, the SAC identifies the accounts with respect to which the Overdraft Fees were assessed (and the account holder). With only slight effort, this identifies the transferee and aids in identifying the transfers related to the Overdraft Fees, for the reasons given with respect to the fraudulent conveyance counts. Moreover, now that the court has announced its intention to dismiss all claims against Lakeland Financial, the reference to "Lake City" in the SAC at ¶ 481, has narrowed considerably: Lake City Bank is the only transferee at issue. Trustee's counsel confirmed as much at oral argument. Tr. at 76:3-12 (confirming no "avoidance exposure" for Lakeland Financial).

Although it certainly would have been better practice for the Trustee to provide the detail in his pleading to forestall Lake City's specificity challenge, Rule 8 and the liberal pleading philosophy of the federal rules do not require the heightened pleading that Lake City seeks. Moreover, the discovery rules and pretrial procedures afford ample basis for fleshing out and testing the preference claim. Requiring a defendant to carefully craft interrogatories, other discovery requests, or requests to admit is the price that we pay for the liberal pleading rules that have been a part of federal practice for decades. Of course, if at trial the Trustee is unable to specify the transferors, the amounts, the sources of funds, or other particulars, he should not be

---

[23] *See, e.g., Valley Media, Inc. v. Borders, Inc., (In re Valley Media, Inc.)*, 288 B.R. 189 (Bankr. D. Del. 2003).

surprised if the District Court directs, or the jury renders, a verdict against him on his preference claim.  Today, however, the court is concerned only with notice pleading.

As a legal matter, Sixth Circuit authority, specifically *Montgomery, supra*, recognizes that a debtor-depositor's prepetition check kiting scheme may expose the debtor's bank to preference liability.  In other words -- again for preference purposes -- a provisional credit may qualify as an "antecedent debt" under § 547(b)(2), and when the debtor-depositor satisfies that antecedent debt, the court recognizes that a transfer has occurred.  *Montgomery*, 983 F.2d at 1396 ("The assets obtained by kiting checks at Sovran Bank, Metropolitan Federal and Investors Federal were clearly in Mr. Montgomery's control, and his use of such assets to grease the squeaky wheel at Third National constituted a preferential transfer.").  A later Sixth Circuit decision distinguished and criticized *Montgomery*, but remarked that "the decision provides guidance for situations where the depository or collecting bank acts with knowledge of the kiting scheme," the situation that the SAC presents here.  *See Cannon*, 237 F.3d at 720.[24]  This authority fortifies the court's conclusion that the Trustee has stated a preference claim even with respect to the provisional credits satisfied in the ninety days leading up to the Debtors' respective petitions.[25]

The court will deny the Motion with respect to Count XXI.

J.  Dismissal Based on the Uniform Fiduciaries Act's Failure to Create a Private Right of Action

---

[24] In its reply brief, Lake City argued that (under Article 4 of the Uniform Commercial Code) it enjoyed a security interest in the various accounts at issue when it extended provisional credits, but stopped short of arguing that this security interest dooms the preference case to the extent premised on the provisional credits as antecedent debt -- a natural reading of *Cannon*, 237 F.3d at 720 ("Since First Tennessee had a valid security interest [under Article 4 of the Uniform Commercial Code], the satisfaction of that interest was not preferential under 11 U.S.C. § 547(b)(5).").  Lake City Defendants' Reply to Trustee's Response at pp. 8-11.  Inexplicably, and as its counsel confirmed during oral argument, Lake City elected not to make that argument in support of dismissal of the preference count.  Tr. at 129:3 – 130:6 (stating that "we haven't argued that the preference actions should be dismissed based on that lien" and confirming, in response to the court's inquiry, that its only argument against the preference count was that the Trustee "didn't make a short and plain statement of the claim.").

[25] Additional briefing at the appropriate juncture may persuade the court that intraday credits (as opposed to more durable overdrafts) deserve different treatment, but the Defendants have not yet argued the point persuasively.  The court regards the question as open, at least with respect to the preference claim.

The Trustee also seeks recovery under the Uniform Fiduciaries Act (Count XXVII) as enacted in Indiana.  Ind. Code §§ 30-2-4-1 *et seq.* (hereinafter the "UFA").  The Defendants argue, however, that the UFA does not create a private right of action, but instead simply immunizes a bank from liability elsewhere conferred.  For several reasons, the Defendants have the better argument.

In Indiana, when a plaintiff asserts a right to relief based on a statute that does not expressly provide a right of action, the issue is "purely a question of legislative intent, not judicial preference." *Doe #1 v. Indiana Dep't of Child Servs.*, 81 N.E.3d 199, 202 (Ind. 2017).  The Indiana Supreme Court has described its longstanding reluctance "to infer this unwritten intent, since the legislature often creates rights of action using clear language."  *Id*. (citations omitted).  To determine whether a statute that imposes duties creates a private right of action in Indiana, a court must inquire whether the statute "(1) primarily protects the public at large and (2) contains an independent enforcement mechanism." *Id*. (citations omitted).

As applied here, the test does not rule out recognizing a private right of action because the UFA does not primarily protect the public at large, nor does it contain any enforcement mechanism.  Nevertheless, the question remains one of the legislative intent prompting enactment of the UFA.

In a case described as one of "first impression," the Indiana Court of Appeals summarized the UFA's purpose as follows:

> Courts in jurisdictions adopting similar versions of the UFA have stated that "'[t]he purpose of the Act is to facilitate the fiduciary's performance of his responsibilities by limiting the liability of those who deal with him,' and 'to cover situations which arise when one person honestly deals with another knowing him to be a fiduciary.'" *Appley v. West,* 832 F.2d 1021, 1031 (7th Cir.1987) (citations omitted). The UFA relieves a depository bank of the duty of seeing that funds are properly applied and places the burden upon the principal to employ honest fiduciaries. *Hosselton v. First American Bank N.A.,* 240

> Ill.App.3d 903, 181 Ill.Dec. 557, 561, 608 N.E.2d 630, 634 (1993), *appeal denied* 151 Ill.2d 564, 186 Ill.Dec. 381, 616 N.E.2d 334. By relaxing some of the harsher rules which require banks and individuals to exercise the highest degree of vigilance in the detection of a fiduciary's wrongdoing, the UFA provides protection for banks who deal with authorized fiduciaries except where they know the fiduciary is breaching his or her duty to the principal involved, or where they have knowledge of such facts that their action in dealing with the fiduciary amounts to bad faith. *Zions First National Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1100 (Utah 1988).

*UNR-Rohn, Inc., a Div. of UNR Indus., Inc. v. Summit Bank of Clinton Cnty.*, 687 N.E.2d 235, 238 (Ind. Ct. App. 1997).

The Indiana Court of Appeals naturally consulted the laws of sister jurisdictions, as the UFA expressly requires. Ind. Code § 30-2-4-13 ("This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it."). One of the cases that the *UNR-Rohn* panel cited approvingly, a federal decision construing Illinois law, specifically observed that the "UFA did not create the cause of action," but instead provided "a defense to such an action unless the bank has actual knowledge that the fiduciary is breaching his fiduciary obligations or the bank acts with bad faith." *Appley v. West*, 832 F.2d 1021, 1031 (7th Cir. 1987). The other two cases cited in *UNR-Rohn* involved causes of action derived from other sources (e.g., common law, contract, the Uniform Commercial Code).

For the most part, the caselaw the Trustee cites involve causes of action not dependent on the UFA, or the unchallenged assumption that the UFA creates its own right of action. As far as the briefs and the court's own research reveal, the only authority from a state's highest court squarely addressing the issue concludes that the "[UFA's] plain language and its legislative history evidence a legislative intent to provide a limited immunity to banks from common law causes of action -- not to provide a new affirmative cause of action against a bank." *Lembo v. Marchese*, 231 A.3d 735, 744 (N.J. 2020). The *Lembo* court's analysis of whether a statute creates an implied cause of action reflects many of the same factors the Indiana Supreme Court would likely consider

to divine legislative intent, principally the text of the statute itself and deference to the legislative branch. *Compare Lembo*, 231 A.3d at 744 ("the Legislature knows how to craft a statutory scheme that provides for a cause of action to complement or supplant the common law") *with Doe #1*, 81 N.E.3d at 202 (Indiana courts are reluctant to infer private rights of action from statutory text "since the legislature often creates rights of action using clear language").

The parties have not cited, and the court has not located, specific Indiana legislative history surrounding the UFA, but a Harvard Law Review article dating back to the time of the initial promulgation of the UFA suggests that the Act "owes its formulation to a resolution adopted by the Executive Council of the American Bankers' Association in 1919."  Maurice H. Merrill, *Bankers' Liability for Deposits of a Fiduciary to His Personal Account*, 40 Harv. L. Rev. 1077, 1086 (1927).  The same roughly contemporaneous, secondary authority also recognizes "the general principle that one who knowingly assists a fiduciary in a breach of duty thereby incurs liability to the principal for the loss sustained."  *Id.* at 1087.  Both point against recognizing a private right of action under the UFA, the first given the source of the legislation,[26] and the second, given the consensus that a right of action already existed at the time.

From the foregoing, especially the professed reluctance of the Indiana Supreme Court to imply private rights of action from statutory text and the persuasive analysis of the New Jersey Supreme Court, coupled with the rule of construction in Ind. Code § 30-2-4-13 (urging uniform interpretation among the adopting states), the court concludes that the UFA does not create a private right of action.  Instead, the court predicts that the Indiana Supreme Court would construe the UFA as enacting only a defense to a cause of action originating outside the Act.  *Cf. Est. of*

---

[26] Common sense suggests that the bankers who assembled in 1919 did not intend to augment the grounds for bank liability by endorsing a private right of action against themselves.

*Barney v. PNC Bank, N.A.*, 714 F.3d 920, 925 (6th Cir. 2013) (repeatedly observing under Ohio law that the UFA creates an affirmative defense).[27]

The court will dismiss Count XXVII.

K.   <u>Dismissal Based on the Absence of any Fiduciary Duty and Failure to State a Claim for Aiding and Abetting Breach of Fiduciary Duty</u>

The Trustee asserts four counts (Counts XXXII-XXXIV and XXXVI) attempting to inculpate the Lake City Defendants on a fiduciary breach theory. These counts are not models of clarity, blurring Mr. Khan's clear fiduciary duty as a director, with a murkier, more attenuated theory of the Lake City Defendant's liability on a fiduciary theory. Only Count XXXVI asserts a fiduciary breach theory without relying to some extent on Mr. Khan's fiduciary duty as director of the IOI Debtors.

For example, Counts XXXII-XXXIV attempt to fashion liability on the Lake City Defendants derived from Mr. Khan's fiduciary duty as a director of the IOI Debtors. Similarly, the SAC blurs the lines between direct and derivative fiduciary liability in Counts XXXIII and XXXIV, specifically by alleging Mr. Khan's fiduciary duty to the IOI Debtors as a director, describing how Lake City, the Core Group, and Mr. Toothaker "each provided direct and critical assistance to Mr. Khan in furtherance of the check kiting scheme" (hinting at "aiding and abetting") before concluding that "Lake City, the Core Group, and Mr. Toothaker each owed the IOI Debtors fiduciary duties by virtue of the IOI Debtors placing confidence in its bankers . . . ." SAC at ¶¶

---

[27] The court recognizes some tension in holding that the UFA merely provides a statutory defense to claims against a bank that involve assisting a fiduciary in breaching his duties to his principal, on the one hand, while also concluding that Indiana does not recognize a separate tort for aiding and abetting a fiduciary's breach of duty. The short answer is that the UFA provides a defense to a broad range of claims falling within the statutory language, such as common law claims based on agency, contract, or perhaps the Uniform Commercial Code itself. The court's role is not to remedy the shortcomings within a statute or a complaint, but to resolve questions the parties present. Because the court will grant the Trustee leave to amend his pleading, it will be up to him to articulate the appropriate theories of claim if so advised. *See infra* p. 43.

570, 578-79, 587, 594-95.  These counts echo Count XXXIV's "aiding and abetting" theory to a considerable extent.

Count XXXVI, in contrast, alleges that the Defendants directly owed a fiduciary duty to the IOI Debtors because of the supposed confidential relationship arising from the "special circumstances" associated with Mr. Khan's allegedly illicit relationship with the Lake City Defendants.

To the extent the Trustee is asserting claims for aiding and abetting Mr. Khan's breach of his fiduciary duties, the court will dismiss the counts for the reasons given with respect to the counts against Mr. Toothaker.  In short, the Trustee fails to state a claim against the other Defendants for aiding and abetting Mr. Khan's alleged breach of fiduciary duty to his companies. *See supra* p. 19.

As for Count XXXVI (alleging Lake City Bank's breach of its own fiduciary duty), the count fails for different reasons.  First, as both parties apparently agree, the baseline rule in Indiana is that banks do not owe fiduciary duties to their customers: "[t] he mere existence of a relationship between parties of bank and customer or depositor does not create a special relationship of trust or confidence." *Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 639 (Ind. Ct. App. 2015) (quoting *Wilson v. Lincoln Fed. Savings Bank*, 790 N.E.2d 1042, 1046 (Ind. Ct. App. 2003)).

The usual articulation of a claim for breach of fiduciary identifies three elements:

> (1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary.

*Farmers Elevator Co. of Oakville v. Hamilton*, 926 N.E.2d 68, 79 (Ind. Ct. App. 2010).  Here, however, rather than alleging three elements of the claim, the Trustee alleges only two (the Defendants' alleged misconduct and the resulting harm).  The Trustee seems to argue that the

Defendants' misdeeds and the IOI Debtors' losses supply the first element -- the existence of a fiduciary relationship. The court rejects this as bootstrapping.

The Trustee argues that Mr. Khan's success at ingratiating himself with the Core Group and the bank generally, and persuading them to join his check kiting scheme, while keeping the IOI Debtors' other managers in the dark, constitutes "special circumstances" establishing a confidential relationship between the IOI Debtors and their bank. Rather than emphasizing the IOI Debtors' reposing of confidence in Lake City, which appears to be the premise of recognizing a confidential relationship under Indiana law, the SAC instead alleges that the depositor's ordinary confidence was extraordinarily unwise under the circumstances. In effect, the allegation is that the Lake City Defendants took advantage of the IOI Debtors' ordinary commercial reliance on their depository institution, not that the depositor relied more than usual on the bank.

The cases involving the special circumstances that might support recognizing a confidential or fiduciary relationship involve inexperienced *individuals*, not sophisticated corporations like the IOI Debtors. *See Kreighbaum v. First Nat'l Bank & Trust*, 776 N.E.2d 413, 419 (Ind. Ct. App. 2002); *Wilson v. Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1046–47 (Ind. Ct. App. 2003). Having considered these authorities, the court agrees with the Seventh Circuit's observation that, "the Indiana courts would not extend the presumption [of a fiduciary relationship based on defendant's superior position] to a commercial relationship" like the one between the IOI Debtors and Lake City Bank. *Interactive Intel., Inc. v. KeyCorp*, 546 F.3d 897, 901 (7th Cir. 2008) (refusing to recognize a fiduciary duty between bank and its customer under Indiana law despite allegations that a bank employee, with the bank's knowledge, secretly overcharged the customer $2 million).

*Interactive Intel.* is not on all fours with the current case, but it points against imposing fiduciary duties in the corporate commercial context.[28]

The court will dismiss the breach of fiduciary duty counts, whether premised on aiding and abetting Mr. Khan's own breach, or the Defendants' supposed abuse of their own relationships with the IOI Debtors.

L.  Dismissal Based on the Racketeer Influenced and Corrupt Organization Act and Indiana Counterpart

The Trustee has stated plausible conspiracy claims under RICO and its Indiana counterpart. 18 U.S.C. §§ 1961 *et seq.*; Ind. Code §§ 35-45-6-1 *et seq.*

First, the parties agree that a RICO conspiracy claim depends on an independent violation of 18 U.S.C. § 1962(c). To state a predicate claim under § 1962(c) sufficient to support a conspiracy claim under § 1962(d), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *United States v. Sinito*, 723 F.2d 1250, 1260 (6th Cir. 1983) (a RICO conspiracy claim requires the establishment of a substantive RICO violation). Here, the Trustee's allegations that Mr. Khan conducted a massive check kiting scheme involving numerous wire and other transactions touching interstate commerce, plausibly fits the bill. *See* SAC at Count XXIX. [29] The Lake City Defendants challenge the RICO claims principally as

---

[28] It is, of course, conceivable that another theory under Indiana law might support a right to relief, but the court is not persuaded to recognize that Lake City owed a fiduciary duty under the circumstances of this case. The court recognizes that plaintiffs in federal litigation do not have to plead theories, only facts supporting a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, a plaintiff, who advocates a precise theory of claim in response to a dismissal motion -- especially a sophisticated and well-counseled plaintiff -- cannot expect the court, *sua sponte*, to identify some other theory of claim that might survive a motion under Rule 12(b)(6). That said, the Trustee will have an opportunity to rework this argument in a third amended complaint, if he so chooses.

[29] At oral argument, the court inquired whether the Liquidating Plan contained a release of Khan that affected the conspiracy claim. *See* Tr. at 98:5-6; Liquidating Plan at p. 11, ¶ 1.115 ("Released Parties"). Trustee's counsel responded that the Liquidating Plan carved out claims against Khan from the release provisions, and Defendants did not press the point. *Id.* at 127:13-14. Moreover, Khan has not responded to the SAC and is in default. The court assumes, without deciding, that Count XXIX against Khan is viable and supports the RICO claims against the other Defendants.

failing to allege (1) any qualifying enterprise with requisite durability and structure, separate from the racketeering activity itself; and (2) any illicit agreement between Mr. Khan and the specified defendants.

Taking the first challenge first, RICO defines "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  The latter phrase involving individuals "associated in fact" is exceedingly broad, showing that Congress eschewed formality in its quest to target organized criminal activity.  Here, the Trustee alleges the least formal version of a statutory enterprise, an "association in fact" enterprise.  There is no controversy about what is required to allege such an enterprise, only whether Trustee has done so.

To qualify as a RICO enterprise, the association must have (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose.  *Boyle v. United States*, 556 U.S. 938, 944 (2009).  The enterprise, moreover, must be separate from the pattern of racketeering activity.  *United States v. Turkette*, 452 U.S. 576, 580–81 (1981).  The Supreme Court explained that the association-in-fact enterprise must be a "continuing unit that functions with a common purpose."  *Boyle*, 556 U.S. at 948.  Lake City contends that the Trustee's supposed "enterprise" flunks this test.  The court disagrees.

The Trustee alleges that the purpose of the enterprise was to enrich the participants by exploiting Mr. Khan's check kiting scheme -- Mr. Khan through embezzling the illicit provisional credits and the Lake City Defendants by maximizing the Overdraft Fees (resulting in performance bonuses for the bank officers based on the same).  The supposed profiteering associated with the check kiting certainly supplies an age-old purpose for many a criminal enterprise, if that is what

the Trustee proves at trial.  *See* SAC at ¶¶ 24, 543, 561.  In other words, "[t]he common purpose of making money can support the enterprise element" in our Circuit.  *United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006).

As for relationships and longevity, it is not implausible to infer relationships between Mr. Khan and the alleged conspirators that enabled the check kiting to persist for nearly a decade as the Trustee contends.  Longevity sufficient to permit the enterprise to achieve its purpose leaps from the Trustee's pleading.  Moreover, the inferences to be drawn at the pleading stage from thousands of suspicious activity alerts that the supposed conspirators allegedly ignored, then downplayed, then covered up, also support the Trustee's RICO conspiracy claim.  SAC at ¶¶ 118, 153, 227.  It is plausible to imagine a sufficient degree of coordination between Mr. Khan and the Core Group from which a jury might infer a structure to support a finding that an illicit and consensual enterprise existed.

The question of whether the alleged enterprise was sufficiently separate from the racketeering activity, as the statutory elements require, will naturally depend on the proofs at trial. At the pleading stage, the court is satisfied with the Trustee's allegations.  The SAC alleges hierarchy in describing Mr. Khan as the mastermind -- the person who determined the timing of the check kiting, making well-timed deposits and withdrawals on various banks.  The role of the Lake City Defendants was admittedly more passive and subordinate, with Findlay (for example) allegedly keeping a lookout for the overdraft alerts and when they regularly arrived, using his positional power within Lake City Bank to put the kibosh on the warnings and those raising the alarm.  *See* SAC at ¶ 290.

Approving the Seventh Circuit's flexible concept of enterprise, the Sixth Circuit in a criminal case quoted the following passage:

> The hallmark of an enterprise is structure... [T]here must be *some structure,* to distinguish an enterprise from a mere conspiracy, *but there need not be much.* A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to *hierarchical or consensual decision-making.* The continuity of an informal enterprise and the *differentiation among roles* can provide the requisite structure to prove the element of enterprise.

*Johnson*, 440 F.3d at 840 (original emphasis) (quoting *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)).  Here, the SAC alleges continuity spanning many years, and "*differentiation among roles*" sufficient to survive a motion to dismiss.

As for the element of an illicit agreement necessary to support a claim for RICO conspiracy, the duration of the check kiting scheme and the persistent disregard of the countless red flags permits the court at this stage of the proceedings to regard as plausible the existence of a conspiratorial agreement.[30]  Moreover, and certainly much later in the supposed conspiracy, the steps recounted in the SAC that the members of the Core Group took to conceal their alleged complicity, including the agreement in the Kahn Guaranty to continue covering bad checks and to alert Mr. Khan if other banks raised concerns about his deposit practices, make plausible the allegations of an illicit agreement.  SAC at ¶¶ 42-43.

The allegations within the SAC are consistent with an inference of incompetence, certainly, but also incrimination.  The latter inference, since plausible, prevents dismissal of the RICO counts under Rule 12(b)(6).

---

[30] Furthermore, an illicit agreement might plausibly explain the Defendants' disregard of the over 3,200 "kiting suspect reports," or their supposed adoption and repetition of Khan's flimsy explanations for financing IOI's operations through the daily and costly uncollected balances as compared to traditional financing.

CONCLUSION AND ORDER

The court in this opinion has announced its intention to dismiss several of the Trustee's counts, but will grant leave to amend as the Sixth Circuit presumptively requires. *Roskam Baking Co. v. Lanham Mach. Co.*, 288 F.3d 895, 906 (6th Cir. 2002).

The court acknowledges the fact that if the Trustee elects to amend, the next amendment will be the fourth version of his complaint, nearly two years after he filed it, and after extensive pre-suit investigation under Rule 2004. The court, however, discounts these factors for several reasons. First, the first year or so after he filed the original complaint, the Trustee and the other parties spent time trying to settle it. This is time well-spent and the court will not penalize the Trustee for engaging in these admittedly extensive and time-consuming discussions. Second, the second version of the pleading (redacted) reflected the Trustee's effort to comply with a protective order previously entered in the Debtors' bankruptcy case -- again, well-intentioned. The third version of the complaint only came after the court granted as unopposed the Trustee's Motion for Leave to File Second Amended Complaint, resulting simply in the filing an unredacted version of a pleading the Defendants had already seen (ECF No. 43). As for the pre-suit investigation under Rule 2004, that rule is not designed to abridge the Trustee's rights under Part VII of the Bankruptcy Rules, and declining to permit an amendment on that basis would do just that. The Trustee may amend the SAC.[31]

One final observation is in order. Pleading in the alternative at this stage of the proceeding is permissible under Rule 8(d)(2), but many of the Trustee's causes of action may be in tension with each other, at least when the time comes to apply the *in pari delicto* defense. For example,

---

[31] The court is not encouraging, only permitting, amendment. Indeed, the court's dismissal of several counts is premised not on pleading deficiencies, but on differing views of applicable law. It goes without saying that the latter will not be resolved by amending the pleadings.

to establish his counts to avoid transfers and obligations based on actual fraud, the Trustee must establish the transferor's intent to defraud -- *i.e.*, the intent of one or more of the IOI Debtors in most instances.  But establishing this fraudulent intent at trial will likely fortify the *in pari delicto* defense as applied to counts other than those under chapter 5 of the Bankruptcy Code, such as the state and federal RICO and other non-bankruptcy counts.  Accordingly, nothing in today's opinion should be read as forecasting success at trial.  The parties have a long path ahead.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Motion to Dismiss filed by Mr. Toothaker (ECF No. 68) is GRANTED and all counts naming Mr. Toothaker as a defendant are DISMISSED as to him;

2. The Defendants' Motion to Dismiss the Second Amended Complaint (ECF No. 70) is (A) GRANTED as to Lakeland Financial Corporation and all counts naming Lakeland Financial Corporation as a defendant are DISMISSED as to that entity; and (B) GRANTED IN PART and DENIED IN PART, as to the Defendants other than Lakeland Financial Corporation;

3. The following counts of the Second Amended Complaint are DISMISSED:

   a.   Counts V, VI, VII, and VIII; and

   b.   Counts XXVII, XXXII, XXXIII, XXXIV, and XXXVI.

IT IS FURTHER ORDERED that any counts not enumerated in the immediately preceding decretal paragraph remain for decision, subject to and as limited by the rulings reflected in the text of this Memorandum of Decision and Order.

IT IS FURTHER ORDERED that (1) the Trustee may amend the Second Amended Complaint, if so advised, within 21 days from the entry of this Memorandum and Decision of Order; and (2) the Defendants shall answer or file a response within 21 days after the filing of the Trustee's amendment, if any.

IT IS FURTHER ORDERED that Plaintiff's counsel shall promptly, but after conferring with the Defendants' counsel and the courtroom deputy, propose a date or dates for a pretrial conference.

IT IS FURTHER ORDERED that the Clerk shall serve this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon the Plaintiff, the Defendants, and the United States Trustee (by first class U.S. Mail addressed to Matthew Cheney, Esq.).

END OF ORDER

**IT IS SO ORDERED.**

**Dated May 30, 2023**



Scott W. Dales
United States Bankruptcy Judge