UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF MICHIGAN

In re:

NAJEEB AHMED KHAN,[1]

        Debtor.

_____/

Case No. 19-04258
Hon. Scott W. Dales
Chapter 11

In re:

KHAN AVIATION, INC., *et al.*,[2]

        Debtors.

_____/

Case No. 19-04261
Hon. Scott W. Dales
Chapter 11
(Jointly Administered)

In re:

INTERLOGIC OUTSOURCING, INC., *et al.*,[3]

        Debtors.

_____/

Case No. 20-00325
Hon. Scott W. Dales
Chapter 11
(Jointly Administered)

MARK IAMMARTINO,

        Plaintiff,

v.

LAKE CITY BANK, LAKELAND
FINANCIAL CORPORATION, BRADLEY
TOOTHAKER, KRISTIN PRUITT, ERIC
OTTINGER, LISA O'NEILL, DAVID
FINDLAY, and NAJEEB A. KHAN,

        Defendants.

_____/

Adversary Pro. No. 21-80071

---

[1] Estate Tax I.D. No.: 84-6804873.

[2] The Debtors in these jointly administered cases (the "Khan Entity Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: Khan Aviation, Inc. (0145), GN Investments, LLC (3550), KRW Investments, Inc. (4356), NJ Realty, LLC (3761), NAK Holdings, LLC (4717), and Sarah Air, LLC (4718).

[3] The "IOI Debtors," along with the last four digits of each Debtor's federal tax identification number are: Interlogic Outsourcing, Inc. (1273); IOI Payroll Services, Inc. (1202); TimePlus Systems, LLC (9477); IOI West, Inc. (1405); Lakeview Technology, Inc. (1451); Lakeview Holdings, Inc. (7589); and ModEarn, Inc. (3473).

MEMORANDUM OF DECISION AND ORDER

PRESENT:    HONORABLE SCOTT W. DALES
Chief United States Bankruptcy Judge

INTRODUCTION

When the court partially granted the Defendants' motion to dismiss earlier this year (subject, ultimately, to the approval of the United States District Court), it also granted the Plaintiff, Mark T. Iammartino,[4] leave to amend his complaint.  Plaintiff timely filed his third amended complaint (the "TAC," ECF No. 86), predictably drawing another dismissal motion (the "Motion," ECF No. 93) from Lake City Bank, Kristin Pruitt, Eric Ottinger, Lisa O'Neill, and David Findlay (the "Defendants").[5]  The parties have fully briefed their positions, responded to the court's separate call for additional briefing, and did not pursue additional oral argument.  *See* Order dated Oct. 20, 2023 (ECF No. 101).  The matter is ripe for decision.

RELIEF REQUESTED IN THE MOTION

Commendably, the parties have stipulated to simplify the court's task in addressing the Motion.  For example, they agreed that although the TAC continues to include several counts the court believes should be dismissed, Plaintiff included these counts to preserve them for ultimate resolution by the District Court.  *See* Joint Stipulation Regarding Counts XVIII, XXVII, XXXII, XXXIII, and XXXIV in the Third Amended Complaint (ECF No. 92).  Accordingly, Counts

---

[4] Mr. Iammartino (the "Trustee" or "Plaintiff") appears not individually but solely as the Liquidating Trustee for the Consolidated Estate Trust for the bankruptcy estates of Najeeb A. Khan, the Khan Entity Debtors, and the IOI Debtors.
[5] The court has entered the default of Najeeb A. Khan, who is serving time for his role in the transactions giving rise to this proceeding.  He has not moved to dismiss.  In its Memorandum of Decision and Order dated May 30, 2023 (ECF No. 84, the "First MDO"), the court previously expressed its view that two of the original defendants, Bradley Toothaker and Lakeland Financial Corp., should be dismissed when this matter returns to the United States District Court.  Despite the recommended dismissal of Lakeland Financial and Mr. Toothaker, the court and the parties shall continue to use the original caption on all papers filed in this adversary proceeding, unless ordered otherwise, given the limits on the court's authority and the dictates of Fed. R. Civ. P. 54.

XVIII, XXVII, XXXII, XXXIII and XXXIV are slated for dismissal from this action and will not be considered further in the Bankruptcy Court, subject to the District Court's review under Rule 9033.[6]   Furthermore, the Defendants (other than Mr. Khan) will not waive any rights by not moving to dismiss or strike these counts again, under the terms of the stipulation.

In view of the stipulation, the court focuses on whether the Trustee -- in his fourth iteration of his complaint -- adequately stated a claim for (1) avoidance and recovery of the "Diverted Funds Repayments" as actual or constructive fraudulent transfers under 11 U.S.C. § 548,[7] IC § 32-18-2-14(A) (through § 544), and § 550;[8] (2) avoidance and recovery of payments made on account of the Lake City Loans, the Khan Guaranty, the KRW Loan and the KRW Mortgage under the "actual fraud" provisions of § 548(a)(1)(A), IC § 32-18-2-14(A)(1);[9] (3) avoidance and recovery of preferences under § 547(b);[10] and (4) recovery under the newly-added negligence count.[11]

Through their recent Motion, the Defendants seek dismissal of these counts for failure to state a claim for relief under Rule 12(b)(6), made applicable by Rule 7012, and with respect to counts alleging actual fraud, Rule 9(b), made applicable by Rule 7009.

For the following reasons, the court will grant the Motion in part, and deny it in part.

---

[6] The court will refer to any federal rule of procedure in the text of this opinion simply as "Rule __," relying on the numbering conventions within the rulesets to signal the intended rule.

[7] For convenience, the court will identify the applicable sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, simply by referring to the section, as in "§ 548."

[8] In this opinion the court adopts the capitalized terms as prescribed in the TAC.  The counts taking aim at the Diverted Funds Repayments are Counts V, VI, VII, and VIII.

[9] *See* TAC at Counts IX, XI, XIII, XV, XVII, and XIX.

[10] TAC at Count XXI.

[11] TAC at Count XXXVI.

1. Standard of Review Under Rule 12(b)(6)

The parties do not quarrel about the standards governing a motion under Rule 12(b)(6) and the court recited the usual articulation in its First MDO. A recent opinion from Judge Jonker, who will likely be reviewing today's decision in this mostly non-core proceeding, provides a helpful and succinct summary:

> A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.: Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.

*Brown v. Tribble*, No. 1:22-CV-419, 2022 WL 3643734, at *4 (W.D. Mich. Aug. 24, 2022). It remains true, even after *Twombly* and *Iqbal*, that the trial court must construe the complaint in the plaintiff's favor, accepting the well-pleaded factual allegations and drawing all reasonable inferences in plaintiff's favor. *See Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659, 664 (6th Cir. 2021).

Because the TAC relies to a considerable extent on theories grounded in fraud, including with respect to transfers the Debtors allegedly made with actual intent to defraud, Rule 9(b)'s particularity requirement also bears on today's decision, as Lake City has repeatedly observed in challenging the allegations in this case. Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake," but as the court observed in its First MDO, the rule takes its place alongside -- not above -- the notice pleading requirements of Rule 8. The

Trustee argues, and the court agrees, that "Rule 9's heightened pleading standards should not be read to defeat the general policy of 'simplicity and flexibility' in pleadings contemplated by the Federal Rules."  *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016) (citations omitted); *see* Memorandum in Support of Trustee's Objection to Defendants' Motion to Dismiss Third Amended Complaint ("Trustee's Br.," ECF No. 95) at p. 4.

> 2. <u>Proposed Dismissal of the Counts Related to the Diverted Funds Repayments (Counts V, VI, VII, and VIII)</u>

In the second amended complaint, the Trustee largely treated each of the several Debtors as a unitary or single transferor when describing the machinations that Najeeb A. Khan ("Khan") undertook during his colossal check-kiting scheme at the heart of this controversy.  This indefiniteness in identifying the precise debtor who allegedly effected the transfers under review prompted the Defendants to invoke Rule 9(b)'s particularity requirement, which they again assert in support of the current Motion.  With respect to the bulk of the allegations involving the so-called Diverted Funds, the court did not see fit to address the specificity challenge given its view, premised largely on *Meoli v. Huntington Nat'l Bank*, 848 F.3d 716 (6th Cir. 2017), that a transfer did not occur with respect to the deposit transactions, at least to the extent that Interlogic Outsourcing, Inc. ("Interlogic") moved money from one of its accounts at another bank to one of its accounts at Lake City Bank.  *See* First MDO at p. 25 ("Moving money from one of the debtor's pockets into another is not a transfer because the depository does not exercise dominion and control over its depositor's account sufficient to treat the deposit itself as a transfer.").

Moreover, the court was not willing to dissect the check clearing process in the manner the Trustee proposed -- treating Lake City Bank as a transferee with respect to the allegedly fraudulent deposits that, according to the Trustee, funded Khan's scheme to enrich himself.  The court observed that "dominion and control" is the key to tagging a depository with fraudulent transfer

exposure and relied on the Sixth Circuit's observation in *Meoli* that "banks are not 'transferees' with respect to ordinary bank deposits," *Meoli*, 848 F.3d at 724, characterizing this conclusion as a matter of law.  The *Meoli* court, after an extensive discussion of caselaw from around the country, summed up its research by stating that "depository banks lack dominion and control over deposits." *Id.* at 726 (citations omitted).

Nevertheless, the Trustee, availing himself of the court's leave to file an amended pleading, endeavored to fortify his factual allegations of Lake City Bank's supposed dominion and control, implicitly raising arguments the court previously rejected and continues to reject.

The Trustee argues, based on additional detail included in Exhibits E and F, that "all of Lake City's advances diverted by Khan were repaid with funds transferred to Lake City from IOI Payroll and TimePlus accounts at Berkshire."  Trustee's Br. at pp. 5-6.  What Exhibit E shows, more precisely, and what the TAC alleges, is that the supposedly avoidable transfers were the deposits coming from the TimePlus and IOI Payroll accounts at Berkshire and going into the Fraud Accounts[12] at Lake City Bank, some in the name of TimePlus and IOI Payroll, and some in the name of Interlogic.  Explaining the theory more precisely, the Trustee coins the term "Diverted Funds Repayments" in the introductory portion of his latest pleading:

> Specifically, Khan maintained three accounts at Lake City through which he conducted the fraud in the names of three different Debtors –Interlogic, IOI Payroll, and TimePlus. Khan would divert funds from one of the Debtors' accounts at Lake City and then repay the diversion by transferring funds from one of the Debtors' accounts at Berkshire—often from the account of a different Debtor. For example, Khan would divert funds from Interlogic's account at Lake City (Lake City account number 1318) and repay the indebtedness by transferring funds from IOI Payroll's account at Berkshire (Berkshire account number 9880). The transfer of funds to Lake City from IOI Payroll's account at Berkshire satisfied Interlogic's indebtedness to Lake City and eliminated the exposure Lake City had undertaken if the transfer had not cleared. These repayments of the diverted funds (the "Diverted Funds Repayments") are set forth on Exhibit E to the Complaint.

---

[12] This loaded term comes from the TAC itself.

TAC at ¶ 10.

To the extent that, say, funds from the Berkshire accounts of TimePlus were deposited into the Lake City accounts of TimePlus, the court's earlier analogy about moving funds from one pocket to another in the same pair of pants still holds. To the extent that the TAC alleges that funds from the Berkshire accounts of TimePlus were deposited into, say, the accounts of IOI Payroll or Interlogic, the Trustee, correctly, argues a transfer *between* those Debtors, but not necessarily between any of the Debtors and Lake City Bank. To tag Lake City Bank as a transferee, however, the Trustee delves into the workings of the Fraud Accounts, as he reveals in the italicized phrase within the following passage:

> Over the course of his fraudulent scheme, Khan would write checks drawn on the Fraud Accounts and deposit such checks into non-IOI accounts controlled by Khan. When those checks were presented to Lake City while there was a negative collected balance in the Fraud Accounts, Lake City would advance funds to the presenting bank to honor such checks. Then, as funds were collected from IOI's accounts at Berkshire, *Lake City would apply such collected funds against the advances.* These Diverted Funds Repayments are set forth in Exhibit E hereto.

*See, e.g.*, TAC at ¶ 381 (emphasis added). In short, the Trustee identifies the allegedly voidable transactions as the application of collected funds against previous advances within each of the Fraud Accounts. Put differently, the Trustee asks the court to treat the process of liquidating the debits and credits within the Fraud Accounts as akin to Huntington Bank's satisfaction of Cyberco's debt on its term loans, rather than Huntington's relationship with the "excess deposits" in *Meoli*. Recall that the *Meoli* court recognized Huntington's dominion and control over the former but not the latter. *Meoli*, 848 F.3d at 720, 725.

To demonstrate Lake City Bank's supposed "dominion and control" over those accounts (aiming to avoid the *Meoli* court's admonition that depositories lack dominion and control over

deposit accounts), the Trustee points to the terms of the Account Agreement and Lake City Bank's

repeated decisions to permit Khan to overdraw the Fraud Accounts:

> Specifically, as alleged in the Third Amended Complaint, the Terms and Conditions governing IOI's accounts at Lake City (the "Account Agreement"), provide that Lake City reserved the absolute right to refuse to honor any check or withdrawal request if there were insufficient collected funds in Interlogic's accounts—a right that Lake City exercised on the Disruption Date when it refused to honor checks Khan had deposited at KeyBank, and a right that further establish that Lake City exercised dominion and control over the Fraud Accounts while there was a negative collected balance. . . . As Khan's co-conspirators, Lake City and the Core Group exercised dominion and control over the Fraud Accounts by, amongst other ways, actively monitoring and segregating the accounts for internal purposes and exercising the discretion to grant daily extensions of credit to cover uncleared funds.

Trustee's Br. at p. 2.  The Trustee further explains his reliance on the Account Agreement:

> The facts alleged in the Third Amended Complaint establish that Lake City had, and exercised, dominion and control over the Diverted Funds Repayments. First, Lake City actually exercised dominion and control over the Diverted Funds Repayments by choosing to apply them to extinguish the negative collected balances in the Fraud Accounts. Second, as detailed in the Third Amended Complaint, the Terms and Conditions governing IOI's accounts at Lake City (the "Account Agreement") gave Lake City the absolute right to refuse to honor any check or withdrawal request if there were insufficient collected funds in the account at the time of the request, as well as the right to set off without prior notice any amounts deposited in the account against any obligation owed to the bank. (TAC ¶ 326.) Given that Khan maintained a near constant negative collected balance in the accounts from at least 2015 through the Disruption Date, Lake City maintained near constant dominion and control over the Fraud Accounts.

*Id*. at p. 10 (footnote omitted).

First, the Trustee's reliance on the Account Agreement's overdraft and setoff provisions

proves too much, just as the *Meoli* trustee's security interest theory did in that case.  *Meoli*, 848

F.3d at 727-28.  In the court's experience, depository banks routinely include such standard

provisions in their deposit agreements, so accepting the argument would give virtually every

depository "dominion and control" over their customers' deposit accounts, contrary to *Meoli*.

Second, although the Trustee seeks to find Lake City Bank's dominion and control in its advancing of provisional credits, the actual repayment depended (according to the TAC) on Khan's strategically timed deposits. The Trustee alleges that Khan masterminded the check-kiting or fraud scheme[13] and that Khan himself controlled the deposits into the Fraud Accounts[14] upon which the Diverted Funds Repayments depended each day. He alleges that Khan initiated the withdrawals from the Fraud Accounts, to embezzle or divert funds to himself and other entities he controlled.[15]

The main indicia of control adverted to in the TAC is Lake City Bank's discretion, illegally exercised in the Trustee's view, to extend credit by allowing Khan to overdraw the accounts. So, Khan, whom the Trustee describes as the mastermind of the check kiting scheme, initiates the precisely timed deposits and withdrawals from the Fraud Accounts, but the depository (Lake City Bank) nevertheless exercised "dominion and control" over those same accounts, or so says the Trustee. Nevertheless, the gravamen of the TAC is that Khan controlled the Fraud Accounts. The recently added allegation that Lake City Bank, instead, exercised "dominion and control" because it made advances implausibly flies in the face of the very same pleading, and smacks of the clever labeling the Supreme Court condemned in *Iqbal* and *Twombly*. It is not plausible to conclude that a defendant has dominion and control over a deposit account when someone else has dominion and control over the same deposits and withdrawals, especially where, as here, the timing of the deposit and withdrawal cycle is allegedly so precise.

The TAC and the Trustee's response to the Defendants' Motion fail to exclude the deposits which Lake City Bank allegedly used to effectuate the Diverted Funds Repayments from the *Meoli*

---

[13] *See, e.g.*, TAC at ¶¶ 343, 351, 360, 369, 379, 393, 408, 423,547, 601, 617.
[14] *See, e.g.*, TAC at ¶¶ 109, 117, 129, 163, 225, 344, 345, 352, 353, 361, 362, 370, 371, 381, 394, 409, 424, 559, 578, 602, 618, 634.
[15] *See, e.g.*, TAC at ¶¶ 42, 113, 237.

panel's holding that banks are not "transferees" with respect to ordinary deposit account transactions. Building on its decision in *Taunt v. Hurtado (In re Hurtado)*, 342 F.3d 528 (6th Cir. 2003), where the Sixth Circuit held that the depositor defendant -- not her depository bank -- had dominion and control over deposit accounts holding funds the debtor transferred to her, the *Meoli* court opined that *Hurtado* "strongly implies that the bank lacks dominion and control over the same deposits." *Meoli*, 848 F.3d at 726. The court elaborated on its understanding:

> When a bankrupt entity transfers property to a third party, and that third party deposits the property into its deposit account, either the third party or the bank exercises dominion and control over the deposits, but not both. If both did, then both would be transferees of the deposits, and the trustee of the bankrupt estate would potentially recover two times the property that was transferred out of the bankruptcy.

*Id*. The *Meoli* court concluded that, in such a situation, the "third party" not "the bank" exercises dominion and control, evidently in part to respect the prohibition against double recovery that § 550(d) proscribes. *Meoli*'s analysis of *Hurtado* describes what the Trustee alleges occurred in the present case, and concludes that the depositor alone, not the depository, has dominion and control. Here, according to the revised allegations, TimePlus and IOI Payroll -- not just Interlogic -- funded the Fraud Accounts that Khan used to enrich himself. More generally, the TAC alleges that the fraudulent transfers came to rest in the Khan Entity Debtors' estates. TAC at ¶ 2 ("Khan engineered his check kiting scheme in order to misappropriate more than $73 million from IOI for his personal use in supporting a lavish lifestyle for himself and his family, including the acquisition of vintage automobiles, airplanes, yachts, motorcycles, real estate, expensive jewelry, and a myriad of personal investments."), ¶ 17 ("IOI's monthly account statements during 2014 through 2016 revealed that Khan was diverting millions of dollars from Interlogic's accounts for his personal benefit."), ¶ 132 ("Khan used the proceeds from his scheme to support his own personal lifestyle,

including his purchase of luxury cars, boats, airplanes, yachts, real estate, and multiple financial investments.  His luxury car collection alone consisted of over 230 exotic cars that were ultimately sold for over $40 million."), ¶ 556 ("Such racketeering activity . . . enabled Khan to illegally use such funds to support his lavish lifestyle that included a luxury car collection, airplanes, and multiple multimillion [dollar] real estate properties.").  The Trustee cannot deny that, while administering the Debtors' joint estates, he has already recovered from the Khan Entity Debtors a substantial portion of the Diverted Funds, presenting the very risk of double recovery the *Meoli* court warned would result from treating the depository institution as a transferee.

The thrust of the TAC is that the "Fraud Accounts" were "personally controlled by Khan." *See, e.g.*, TAC at ¶ 2 (Khan "engineered his check kiting scheme"), ¶ 3 (Khan "operated the scheme"), ¶ 94 (accounts were "personally controlled by Khan"), ¶ 96 (describing accounts as Khan's slush accounts), ¶¶ 106-07 (describing deposit account activity and arrangements Khan used to perpetuate check kiting), ¶ 344 (describing Khan's daily deposits of dozens of checks); *cf.* ¶ 23 (Lake City and Core Group "monitored Khan's deposits").

Moreover, the Trustee now describes each of the actual "transfers" supporting his avoidance counts under §§ 544, 547 and 548 (*i.e.*, the repayment of the overdrafts resulting from Khan's diversions to himself and others) as a "set off," citing the Account Agreement and compounding the court's qualms about the plausibility of the deposit-related avoidance claims. *See* TAC at ¶ 326 (relying on Account Agreement's setoff provision to establish dominion and control).  Setoffs -- if that is what occurred here -- are not "transfers" within the meaning of § 101(54), which means they are not "transfers" under other provisions of the Bankruptcy Code, such as §§ 544, 547, and 548.

Here, in making his case that Lake City Bank exercised dominion and control by exercising its setoff rights, the Trustee lays bare a potential flaw in his chapter 5 causes of action. *See* Trustee's Br. at p. 10 (arguing that "the right to set off without prior notice any amounts deposited in the account against any obligation owed to the bank" gave Lake City Bank dominion and control over the Fraud Accounts). For reasons explained more fully below, however, the court will not decide today whether § 553 dooms any of the avoidance counts. *See, infra*, at pp. 14-18.

Finally with respect to the Diverted Funds Repayments, the Trustee again seeks to distinguish *Meoli* on the grounds that the Fraud Accounts did not involve "ordinary bank deposits" because of Lake City Bank's allegedly longstanding misconduct. *See* Trustee's Br. at p. 2 ("As Khan's co-conspirators, Lake City and the Core Group exercised dominion and control over the Fraud Accounts by, amongst other ways, actively monitoring and segregating the accounts for internal purposes and exercising the discretion to grant daily extensions of credit to cover uncleared funds.").

The court, however, must recognize a difference between allegations of misconduct on the part of a supposed transferee, on the one hand, and dominion and control, on the other. The avoidance provisions of the Bankruptcy Code, unlike, say, the Racketeer Influenced and Corrupt Organizations (RICO) Act, are ill-suited to address the sort of misbehavior of which the Trustee complains, and misbehavior does not invariably support avoidance. *Cf. Bash v. Textron Fin. Corp. (In re Fair Fin. Co.)*, 13 F.4th 547, 555 (6th Cir. 2021) (in an avoidance action, the question "isn't whether [the defendant] was a bad actor," but whether a transfer occurred under the statute). After reading *Meoli* again, the court still declines to equate allegations of obvious misconduct on the part of a depository institution with dominion and control. The court rejects the Trustee's reading of the statute and binding caselaw in our Circuit.

Accordingly, Counts V, VI, VII and VIII relating to the Diverted Funds Repayments should be dismissed for failure to state a plausible claim for relief.

3. <u>Proposed Dismissal of Payments Made on Various Obligations with Actual Intent for Failure to Plead with Particularity (Counts IX, XI, XIII, XV, XVII, and XIX)</u>

The Defendants restate their prior arguments based on Rule 9(b) with respect to Counts V and VII (relating to the Diverted Funds Repayments as actual fraudulent transfers) and with respect to Counts IX, XI, XIII, XV, XVII, and XIX (relating to the Lake City Loans, Khan Guaranty, KRW Loan and KRW Mortgage as actually fraudulent obligations and payments).

For the reasons just given, the defects in Counts V and VII are more fundamental given the court's conclusion that a depository bank lacks dominion and control over its depositor's accounts, obviating the need to consider the Defendants' particularity arguments.

With respect to the particularity challenge under Rule 9(b) to the loan related counts, Defendants make a perfunctory, single paragraph argument against Counts IX, XI, XIII, XV, XVII, and XIX:

> Likewise, the Trustee also failed to cure his pleading deficiencies with respect to his actual fraudulent transfer claims concerning the Lake City Loans, Khan Guaranty, KRW Loan, and KRW Mortgage set forth in Counts IX, XI, XIII, XV, XVII, and XIX through the addition of Exhibit F. Although Exhibit F purports to itemize each repayment of such loans or obligations generally, it does not specify which of the loans or other obligations at issue were repaid through each alleged transfer.

Motion at p. 11. The court previously rejected this argument directed against the Second Amended Complaint (*see* First MDO at p. 14, noting that "[t]he complaint leaves no room for doubt about the specifics surrounding the incurrence of the Lake City Loans" and that LCB was able to prepare its proofs of claim based on the existing information).

The court, again, rejects this aspect of the Motion, concluding that Counts IX, XI, XIII, XV, XVII, and XIX should be tested in discovery, not dismissed in pleading practice.

4. Proposed Dismissal of Preference (Count XXI)

Defendants make two cogent arguments against the Trustee's preference counts, which the court is nevertheless constrained to reject for two separate reasons.

First, the Defendants cite *Mann v. LSQ Funding Grp., L.C.*, 71 F.4th 640, 646 (7th Cir. 2023), for the proposition that "outright fraud alone cannot bring a transaction within the avoiding powers of the Bankruptcy Code . . . ." Motion at p. 12. The Sixth Circuit suggested the same thing in *Fair Finance*, *supra*. Defendants couple this unremarkable observation with the notion that (1) transfers did not occur within the Fraud Accounts -- or at least that Lake City Bank is not a transferee for fraudulent conveyance purposes under the *Meoli* rationale -- and (2) the statutory term "transfer" has the same meaning in § 547 as it does in § 544 and § 548. *Id.* at pp. 12-13. Accordingly, they urge the court to find no transfers supporting the Trustee's preference counts. The bank also argues that (intraday) provisional credits do not create a debt, given the necessities of the check clearing process. *See Sarachek v. Luana Sav. Bank (In re AgriProcessors, Inc.)*, 859 F.3d 599, 604 (8th Cir. 2017); *Bernstein v. Alpha Assocs., Inc. (In re Frigitemp Corp.)*, 34 B.R. 1000, 1015 (S.D.N.Y. 1983), *aff'd*, 753 F.2d 230 (2d Cir. 1985).

As elegant or appealing as the arguments may be in some respects, they ignore the impact of Sixth Circuit precedent on this court, particularly *First Tenn. Bank, N.A. v. Stevenson (In re Cannon)*, 237 F.3d 716 (6th Cir. 2001) (which merely distinguished *McLemore v. Third Nat'l Bank (In re Montgomery)*, 983 F.2d 1389 (6th Cir. 1993)). *Montgomery* did not appear to draw a distinction between intraday and interday credits, focusing instead on the depositor's ability to use the credits -- an ability the Trustee plainly alleges in the TAC. *Montgomery*, 983 F.2d at 1394-95

(stressing that "whether a debtor has a property interest in the proceeds of an unauthorized loan created by the kiting of checks depends on how much control the debtor has over such proceeds.").

Nothing in the Defendants' current brief changes the court's view that the parties must live, albeit uncomfortably, with the tension between *Meoli* and *Montgomery*, and no opinion from our sister courts in New York, Chicago, or elsewhere changes that.

Lake City Bank's second preference defense, premised on its supposed security interest under Ind. Code Ann. § 26-1-4-210 and the decisions in *Cannon*, *supra*, and *In re AppOnline.com, Inc.*, 296 B.R. 602, 619 (Bankr. E.D.N.Y. 2003), cannot carry the day either, at least not *today*. Both decisions recognized the possibility of preference exposure in cases involving allegations (as here) of a bank's nefarious complicity in a check-kiting scheme and acknowledged that for purposes of preference, "intent is not at issue." *In re AppOnline.com, Inc.*, 296 B.R. at 619. Moreover, it is conceivable that Lake City Bank's bad faith in the "performance and enforcement" of its rights and duties under Article 4 and Article 9 -- if proven -- could compromise its right to rely on the security interest under Ind. Code Ann. § 26-1-4-210, or other protections within the Uniform Commercial Code ("UCC"), given the implied obligation of good faith under the UCC. Indeed, even the *Frigitemp* opinion upon which Lake City Bank relies observed that a bank that continues to advance provisional credit while suspecting a check-kiting scheme may forfeit the usual protections attached to the check-clearing process. *In re Frigitemp Corp.*, 34 B.R. at 1013 ("a bank that accords provisional credit suspecting that the customer is engaged in check kiting does not become a holder in due course").

Finally, in response to the Order dated Oct. 3, 2023 (ECF No. 97), Lake City contends no transfer occurred here -- a conclusion perhaps fortified by § 553 and the TAC's description of the check-kiting scheme as involving a series of advances, deposits, and setoffs.[16]

Courts within our Circuit and scholars alike have concluded that a setoff is not a "transfer" based largely, though not exclusively, on legislative history.

> Congress excluded setoffs from the definition of "transfer" in Bankruptcy Reform Act of 1978. The House bill's defined "transfer" to include a setoff, but that reference to setoff was deleted by the Senate. "The effect is that a "setoff is not subject to being set aside as a preferential 'transfer[']; but will be subject to special rules."

*Kaye v. Carlisle Tire & Wheel Co.*, No. 3:07-00336, 2008 WL 821521, at *3 (M.D. Tenn. Mar. 27, 2008) (citing 124 Cong. Rec. H11090 (daily ed. Sept. 28, 1978; S17407 (daily ed. Oct. 6, 1978) and applying rationale to defeat claims under §§ 544 and 548); *In re Rehab Project, Inc.*, 238 B.R. 363, 372 (Bankr. N.D. Ohio 1999) (a setoff is not included within the definition of "transfer" under § 101(54)); 11 U.S.C. § 103(a) (applicability of chapters); 5 Collier on Bankruptcy ¶ 553.09 (16th ed.) ("In general, a prepetition setoff is not avoidable as a preference under section 547, or as a fraudulent transfer under section 548 or 544.") (citations omitted).[17]

In his supplemental brief, the Trustee endeavors to avoid the consequences of invoking the setoff provisions of the Account Agreement in the TAC by arguing that § 553 protects unexercised setoff rights (a true but likely incomplete statement) and implying that the debtor-depositors (not

---

[16] *See, supra*, at 8.

[17] Indeed, the Bankruptcy Code's provision addressing prepetition set offs could not be clearer in expressing Congress's "hands off" approach to the remedy. With exceptions not relevant here, the Bankruptcy Code "does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . . ." 11 U.S.C. § 553(a). Sections 544, 547 and 548 -- upon which the Trustee relies in Counts V – VIII, IX, XI, XIII, XV, XVII, XIX, and XXI -- are omitted from the exceptions that § 553 enumerates, so the claims premised on those sections are in doubt given that provision. *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 20 (1995) ("Section 553(a), in turn, sets forth a general rule, with certain exceptions, that any right of setoff that a creditor possessed prior to the debtor's filing for bankruptcy is not affected by the Bankruptcy Code.").

Lake City Bank) initiated the setoffs.  The Trustee also denies any mutuality of obligations -- a requirement of setoff -- and suggests that a bank may forfeit its setoff rights under Indiana law through misconduct.  Finally, citing *Meoli*, *Montgomery* and *Cannon*, the Trustee contends that because the Sixth Circuit addressed the check-kiting issues in those cases under chapter 5's avoidance power provisions, the court should not consider the possible application of § 553.  The merits of these various arguments against applying § 553 likely fall on a continuum of persuasive impact, some more ponderous than others, but for several reasons the court will not resolve whether § 553 applies at this time, preferring to consider the matter on a more developed record.

First, the Sixth Circuit, albeit in a different setting, observed that a setoff "is an affirmative defense which must be pled and proven by the party asserting it."  *First Nat'l Bank v. Hurricane Elkhorn Coal Corp. II*, 763 F.2d 188, 190 (6th Cir. 1985).  At this stage of the proceedings, the pleadings are not closed, which means that Lake City may assert § 553 as a defense in its answer if it so choses. Moreover, a plaintiff need not draft around every possible defense.

Second, discovery, coupled with post-discovery motion practice under Rule 56, will give the parties a more fulsome opportunity to develop the record and their arguments for and against the role, if any, that § 553 plays in this matter, allowing the court to consider more thoroughly the Trustee's mutuality and possible state law arguments against setoff.

Third, although the court does not apologize for perceiving the setoff issues before the parties addressed them in their motion papers,[18] the party presentation principle, although "supple,

---

[18] The Trustee first used the term in the TAC, including by excerpting in his most recent pleading the setoff provisions of the Account Agreement.  By entering the Order dated Oct. 3, 2023, the court simply noted that an elephant had entered the room.  A plaintiff who describes a "transfer" as a "setoff" in responding to a motion to dismiss counts under §§ 544, 547, 548, 550, and 551, cannot expect the court to ignore the neighboring provisions of § 553 with all its dramatic implications under the Bankruptcy Code.

not ironclad," counsels in favor of letting the parties control this aspect of their dispute. *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) (discussing party presentation principle).

Finally, even assuming, *arguendo*, that § 553(a) precludes relief under § 547, the TAC seems to allege that Lake City improved its position during the preference period, perhaps subjecting the bank to exposure under § 553(b).  Rule 8 requires a statement of the claim within pleadings, not necessarily citation to authorities. *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) ("[Federal pleading rules] do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."); *Colonial Refrigerated Transp., Inc. v. Worsham*, 705 F.2d 821, 825 (6th Cir. 1983) (rejecting theory of the pleadings doctrine); Wright & Miller, Fed. Prac. & Proc. Civ. § 1219 (4th ed.) (describing theory of pleadings doctrine).

The court will not recommend dismissal of Count XXI at this point in the proceedings.

5.   Proposed Dismissal of Negligence Claim (Count XXXVI)

After the court rejected several of the Trustee's state law claims in its First MDO, the Trustee amended his pleading to allege a negligence claim against Lake City Bank (Count XXXVI).  The negligence claim asserts that the bank owed the IOI Debtors a duty of ordinary and reasonable care, which it breached by, among other things, allowing Khan to violate pre-existing loan agreements with Lake City, failing to adequately train its officers and/or directors to avoid conflicts of interest, permitting Khan to generate negative collected balances in IOI's accounts, allowing Khan to divert IOI funds to his personal accounts, and participating in and concealing Khan's fraud.  TAC at ¶¶ 654-55.  As for damages, the Trustee states that Lake City Bank's negligence resulted in "at least" $86,639,942.10 of damage to the IOI Debtors ($13.5 million in overdraft fees and more than $73 million in Diverted Funds) and "other amounts to be determined at trial." *Id.* at ¶ 656.

In its Motion, Lake City urges the court to dismiss the negligence claim with prejudice in accordance with Indiana's version of the economic loss doctrine. More specifically, Lake City argues that the Trustee failed to allege any personal injury or damage to property, because the Trustee solely sought relief for economic loss in the amount of $86,639,942.10 -- all of which related to the financial dealings between the IOI Debtors and Lake City Bank. Motion at p. 15.

Under Indiana's economic loss rule, "a defendant is not liable under a tort theory for any purely economic loss caused by its negligence," but is liable under a tort theory for negligence that causes "personal injury or damage to property other than the product or service itself." *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010); *Residences at Ivy Quad Unit Owners Ass'n, Inc. v. Ivy Quad Dev.*, LLC, 179 N.E.3d 977, 982 (Ind. 2022) (the economic loss doctrine "generally precludes recovery for 'purely economic loss' caused by negligence in the performance of a contract between parties").

In his response to the Motion, the Trustee does not dispute Lake City's description of the economic loss doctrine as Indiana applies it, or the contractual nature of the relationship between Lake City Bank and its depositors. Rather, the Trustee alleges (only generally) that Lake City caused the IOI Debtors to suffer more than just purely economic loss. He contends that Lake City was not just "negligent in providing treasury management services to the Debtors, but that, among other things, Lake City ignored myriad red flags . . . and knowingly and actively conspired with Khan to facilitate Khan's fraud. . . ." Trustee's Br. at pp. 16-17. Finding *Gunkel v. Renovations, Inc.* illustrative, the Trustee argues that the economic loss doctrine does not apply in this case because, as in *Gunkel*, "damages were to other property of the plaintiff." *Id.* at p. 16; *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150,152 (Ind. 2005).

Unfortunately, the Trustee does not identify these supposed non-economic losses, and the court struggles to read *Gunkel* as the Trustee does. In fact, the clear separation of economic and physical damages in *Gunkel* emphasizes the economic nature of the damages here. In *Gunkel*, plaintiff brought a negligence suit against a masonry company for damage to a home caused by the mason's faulty installation of stone façade. In addition to the repair cost of the stone façade purchased and installed by the masonry company, plaintiff identified additional damages including lost use of the home and repair costs for separate and extensive damage to other parts of the home resulting from the installation. The Indiana Supreme Court ultimately precluded tort recovery for damage to the façade itself under the economic loss rule, concluding that the façade was "bargained for" directly with the masonry company, but allowed tort recovery for the separate damage to the home, and its parts, on the grounds that the additional damage was to "other property" because it was acquired separately. *Gunkel*, 822 N.E.2d at 155-57 ("If a component is sold to the first user as a part of the finished product, the consequences of its failure are fully within the rationale of the economic loss doctrine. It therefore is not 'other property.' But property acquired separately from the defective good or service is 'other property,' whether or not it is, or is intended to be, incorporated into the same physical object.").

Here, the Trustee makes no distinctions that remotely resemble the discriminating analysis in *Gunkel*. The court in *Gunkel* easily identified which damages were associated with the commercial relationship at issue (the façade) and which were separate (the rest of the house). In response to the Motion, the Trustee identifies no such separation in this case, instead emphasizing the nature of the Defendants' conduct rather than the nature of the resulting loss. Lake City makes the same point in its Reply to Trustee's Objection to Lake City Defendants' Motion to Dismiss Third Amended Complaint (ECF No. 96), noting the Trustee's reliance on the bank's wrongdoing

but failing to identify non-economic losses -- *e.g.*, damage to other property or persons.  Had the Trustee reasonably alleged additional damages that resembled some alternative harm to the IOI Debtors beyond that relationship, the court would be more inclined to allow a negligence claim to move forward for those separate damages.  Because the TAC alleges purely economic damages stemming from the banking transactions between IOI and Lake City Bank, however, and because the Trustee has not identified any damage to other property or persons, the economic loss doctrine bars any recovery on a negligence claim.

The Trustee, in passing, submits that dismissal of its negligence claim is premature at this stage of proceedings.  Quoting *Residences at Ivy Quad Unit Owners Ass'n, Inc.*, *supra*, the Trustee argues that "the economic loss doctrine's preclusive effect must yield if the plaintiff has set forth any set of circumstances under which it would be entitled to relief—a relatively low bar."  179 N.E.3d at 983; Trustee's Br. at p. 16.  The court finds no such circumstances here.  Like the Trustee's shortcomings with *Gunkel*, the facts of the present case do not support the Trustee's legal theory.  In *Residences at Ivy Quad*, the plaintiff's complaint sought "recovery not only for 'expense incurred in hiring experts, redesigning of Ivy Quad to correct the deficiencies, and reconstructing, repairing, and restoring Ivy Quad'—which would, indeed, be 'purely economic'—but also for 'damage to other property, including property inside individual units and property other than the building itself.'"  179 N.E.3d at 983-84.  In *Residences at Ivy Quad*, unlike here, the request for damages to "other property" was clear and in writing.  Here, the only thing that is clear from the pleadings is that the Trustee seeks recovery for the $86,639,942.10 lost in the check-kiting scheme.

Therefore, because the court perceives only economic losses resulting from the IOI Debtors' financial transactions with Lake City Bank, the Motion is well-taken.

Accordingly, Count XXXVI relating to the Trustee's negligence claim should be dismissed because it is barred by the economic loss doctrine.

CONCLUSION AND ORDER

The Trustee has not requested, and the court is not granting, additional leave to amend his pleading. This matter shall move to its next stage, starting with the Defendants' filing of an answer to the TAC. After the Defendants file their answer, the court expects the parties to meet and confer regarding an acceptable date for a pretrial conference at which they will discuss next steps including discovery and further pretrial scheduling. If the parties fail to propose at least three acceptable dates within 14 days after the Defendants file their answer, the court will select a date without regard to the parties' preferences.

One final observation: this latest round of motion practice has exposed weaknesses in each party's position, making this matter a good candidate for settlement. The parties should be prepared to discuss additional steps that may aid them in achieving a consensual resolution, including alternative dispute resolution under the District's Bankruptcy Alternative Dispute Resolution Program (LBR 9019-1 through LBR 9019-23), or perhaps less formally involving one of the other judges of this court.

Except to accommodate ADR or for some other extraordinary reason, the parties should expect that, going forward, this matter will proceed apace.

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1. The Motion is GRANTED to the extent it seeks dismissal of Counts V, VI, VII and VIII;

2. The Motion is DENIED to the extent it seeks dismissal of Counts IX, XI, XIII, XV, XVII, and XIX;

3. The Motion is DENIED to the extent it seeks dismissal of Count XXI; and

4. The Motion is GRANTED to the extent is seeks dismissal of Count XXXVI.

IT IS FURTHER ORDERED that the Defendants shall file an answer to the TAC within 14 days after entry of this Memorandum of Decision and Order.

IT IS FURTHER ORDERED that Plaintiff's counsel shall promptly, but after conferring with the Defendants' counsel and the courtroom deputy, propose a date or dates for a pretrial conference to occur within 35 days after Defendants file their answer.

IT IS FURTHER ORDERED that the Clerk shall serve this Memorandum of Decision and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon the Plaintiff and the Defendants.

END OF ORDER

**IT IS SO ORDERED.**

**Dated November 26, 2023**



Scott W. Dales
United States Bankruptcy Judge